[Cite as *Quaye v. N. Market Dev. Auth., Inc.*, 2017-Ohio-7412.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Emmanuel Quaye, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 15AP-1102 |
| v. | : | (C.P.C. No. 14CVC-10496) |
| North Market Development Authority, Inc., et al., | : | (REGULAR CALENDAR) |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on August 31, 2017

**On brief:** *Malek & Malek, LLC,* and *James Malek,* for appellant. **Argued:** *James Malek.*

**On brief:** *David Heinlein,* for appellees Scott Davis and North Market Development Authority, Inc. **Argued:** *David Heinlein.*

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Plaintiff-appellant, Emmanuel Quaye, appeals from a judgment of the Franklin County Court of Common Pleas finding defendant-appellee, Scott Davis, not liable on Quaye's claim of negligence. Quaye presents the following sole assignment of error for our review:

> The trial court erroneously determined that Plaintiff failed to prove by a preponderance of the evidence, that Defendant-Appellee Scott Davis acted negligently on August 12, 2012.

{¶ 2} For reasons that follow, we affirm.

No. 15AP-1102

## I. FACTS & PROCEDURAL HISTORY

{¶ 3} On October 10, 2014, Quaye filed a complaint against the North Market Development Authority, Inc. ("North Market"), Davis, and the administrator of the Ohio Bureau of Workers' Compensation ("BWC"). The facts giving rise to the complaint occurred on August 12, 2012, when Quaye was performing cleaning services at the North Market premises on behalf of his employer, D&J Master Clean, Inc.

{¶ 4} Quaye alleged in the complaint he "was performing work in a utility closet" when Davis, a North Market maintenance employee, came "into the utility closet where [Quaye] was cleaning and proceeded to change the ballast or fluorescent lamp contained within the fluorescent light fixture directly above [Quaye's] head." (Oct. 10, 2014 Compl. at ¶ 14-15.) Quaye alleged that, while Davis "was replacing the ballast or fluorescent lamp he caused it to fall, striking [Quaye] in the head," resulting in an open wound to Quaye's left scalp, a concussion, and cervical sprain and strain. (Compl. at ¶ 17.)

{¶ 5} Quaye asserted that Davis was negligent in failing to "use ordinary care when replacing a fluorescent lamp or ballast," and that the North Market was responsible for Davis' negligence under respondeat superior. (Compl. at ¶ 34.) Quaye also alleged that the North Market was negligent in hiring, training, supervising, and failing "to instruct its employees and agents on proper procedures when replacing a fluorescent lamp or ballast." (Compl. at ¶ 30.) Quaye stated that the BWC might have an interest in any amount Quaye recovered from defendants.

{¶ 6} Quaye filed Davis' deposition on October 7, 2015, and defendants filed Quaye's deposition on October 9, 2015. The court held a bench trial on the matter on October 14, 2015, at which Quaye and Davis presented opposing versions of how the incident occurred.

{¶ 7} At the time of the incident, Davis had been a North Market employee for 35 years. Davis stated that he had changed thousands of light bulbs at the North Market over that period of time. Davis described the closet where the incident occurred as a "small" janitor's closet, "probably about like 18 feet. And they * * * got shelves where they put the trash bags and the towels underneath and everything like that." (Oct. 14, 2015 Tr. at 36.) The light fixture is a "four-foot fluorescent" light fixture which hangs from the ceiling by chains. (Tr. at 128.) The light hangs "over the shelving units that are behind that door." (Tr. at 134.)

{¶ 8} Quaye explained that, on August 12, 2012, he arrived at the North Market at 6:00 p.m. and signed his "name for the register." (Tr. at 50-51.) After he signed in, Quaye met with his supervisor who told Quaye what he was "supposed to do that day." (Tr. at 53.) Quaye proceeded to the janitor's closet to retrieve a "trash can and trash bags and a rag" in order to "start to pick up the trash and clean the tables." (Tr. at 50-51.) Once inside the closet, Quaye began gathering old, dirty "rag[s] that we ha[d] been using," for his supervisor to take "to cleaning." (Tr. at 54-55.) At his deposition, Quaye stated that both he and his supervisor "went to the closet," and "we're there when Scott [brought] the stepladder to the door [of the closet] that--[he] and [his] supervisor were in." (Dec. 11, 2014 Quaye Depo. at 11-12.) At trial, Quaye testified that he was "alone" and was "the only one in the closet." (Tr. at 54.)

{¶ 9} Quaye stated that he had "laid down" to gather the rags which were on the floor, when he heard "a noise with the ladder." (Tr. at 55.) Quaye was "squat[ted] down," when Davis "opened the door and put the ladder in" the closet. (Tr. at 95-96.) Quaye explained that Davis "just pushed the ladder and put the ladder inside. He's climbing up when I was down." (Tr. at 56-57.) Quaye tried to "raise up [his] head," and "[a]ll the structure come down on [his] head." (Tr. at 57-58.)

{¶ 10} Quaye "never said nothing" to Davis throughout the entire time that Davis entered the closet, set up the ladder, climbed up the ladder, and removed the light bulbs. (Tr. at 92.) Quaye stated that there was no "possible way" that Davis did not see him in the closet, as "the closet is not big. It's just a tiny closet. So immediately if you're inside the closet, you're supposed to see." (Tr. at 80.)

{¶ 11} Quaye explained that he was "somewhere in between the edge of that ladder" and a "mop bucket," when the accident occurred. (Tr. at 95-96.) Reviewing a diagram of the closet, Quaye identified that he was on the opposite side of the closet and "a couple of feet from where" the light was located. (Def.'s Ex. A; Tr. at 94, 101-02.) Ed Doersam, a certified electrician who fixed the light the day after the incident, explained that, because the light fixture hung over the shelves, if the light fixture "were to come down at all it would land on top of the shelving unit." (Tr. at 134.) Quaye asserted that the "entire light structure came down on [his] head," but also stated that "the metal that is in front of the light, it came down on [him]." (Tr. at 96, 101.)

No. 15AP-1102

{¶ 12} Davis stated that he first saw Quaye on August 12, 2012 when Quaye came "off the elevator and" went the "opposite way" from Davis. (Tr. at 31, 39.) Davis then went to the closet to change the light. Davis "went in the room. And [he] checked around and [he] didn't see nobody inside the room." (Tr. at 31.) Davis confirmed that there "wasn't nobody in that room when [he] went in that room and changed them bulbs," and specifically that there "was nobody underneath that ladder" when he set it up. (Tr. at 31, 37.)

{¶ 13} There are "two light bulbs" in the light fixture, and Davis explained that "you have to * * * twist the bulbs to get them out." (Tr. at 27, 29.) Davis was using a 6-foot-tall ladder, the ceiling was between 12 and 13 feet high, and the light hung down from the ceiling by a couple feet. A metal reflector is positioned above the light bulbs on the light fixture, and the "light bulbs have to be taken out before" the metal reflector can be detached from the fixture. (Tr. at 124.) When Davis ascended the ladder, he had his "back to the door" of the janitor's closet. (Dec. 11, 2014 Davis Depo. at 18.)

{¶ 14} As Davis was on the ladder removing the light bulbs, he "thought [he] heard some footsteps," and he "was trying to hang onto the light," when the metal reflector "just slipped." (Tr. at 38, 33.) Davis "didn't see anybody. And [he] thought [he] heard a noise. And [Quaye] just comes out of nowhere." (Tr. at 31.) When the reflector slipped, Davis "didn't even know [Quaye] was even back behind" him. (Tr. at 38.) Davis couldn't see Quaye because he "had [his] back [] turned," and Davis first saw Quaye bleeding "when [he] came out from the room" and saw Quaye sitting "on the bench." (Davis Depo. at 20-21.) Davis apologized to Quaye because he "didn't see him." (Tr. at 41.)

{¶ 15} Davis confirmed that it would have been impossible for him to not see another person in the small janitor's closet. Davis stated that he had "no idea" that Quaye would be "coming back" to the closet, and stated that, if he had known Quaye "was coming back that quick, [he] would never have touched that thing." (Tr. at 42.)

{¶ 16} After the incident, Davis called 911 and Quaye was transported to Grant Hospital by ambulance. At the hospital, doctors used metal staples to close the wound on Quaye's head and gave him pain medication. Three days after the incident, Quaye went to a BWC doctor, who told Quaye to "go back to work." (Tr. at 64.) Quaye told the doctor that

No. 15AP-1102

he was "really in pain" and could not "go back to work." (Tr. at 64.) Quaye did not return to work for almost one year after the incident.

{¶ 17} Doersam confirmed that, when he arrived at the janitor's closet the following day, "the light fixture itself was still in place." (Tr. at 130-31.) Doersam stated that only the metal "reflector was not on the fixture," and he "just put it back" by attaching "these two spring clips here * * * and turned them 90 degrees." (Tr. at 122, 124.) Doersam stated that, while it was "not a good practice" to change a light when someone was below you, he did not "know of any specific rule that addresses that situation." (Tr. at 126.) Doersam opined that "[i]t seem[ed] unlikely" that Davis could have entered the closet and set the ladder up while Quaye was also in the closet, as there "[j]ust [wasn't] enough space." (Tr. at 135.)

{¶ 18} On November 5, 2015, the trial court issued a decision and judgment entry, concluding that Quaye "failed to prove by a preponderance of the evidence that either North Market or Davis acted negligently." (Nov. 5, 2015 Decision at 3.) The court observed that Davis "did not see anyone in the closet when he entered," and the court "agree[d] with Davis' assessment" of the incident. (Decision at 2.) The court found Quaye's explanation "of the accident wanting," because, "[i]n order for the reflector to have fallen from the fixture, both lightbulbs must have been removed. This indicates that Davis entered the closet, set up the ladder, climbed to the top of the ladder, and removed both light bulbs before [Quaye] was struck by the reflector." (Decision at 3.) The court concluded that, "[e]ven if [Quaye was] truthful in his assertion that he was in the closet when Davis entered," it was "unreasonable that [Quaye] would not alert Davis to his presence." (Decision at 3.) The court determined that it was "far more likely that [Quaye] entered the closet while Davis was already up on the ladder, startling Davis and causing him to lose grip on the reflector." (Decision at 3.)

## II. ANALYSIS

{¶ 19} Quaye asserts that the trial court erred in failing to find that Davis acted negligently on August 12, 2012. Quaye does not appeal the trial court's ruling with respect to the North Market.

{¶ 20} In reviewing a decision reached at a bench trial, we utilize a manifest weight standard. *Walker v. Hartford on the Lake, L.L.C.*, 10th Dist. No. 16AP-271, 2016-Ohio-7792, ¶ 27. The weight of the evidence is quantitatively and qualitatively different from the sufficiency of the evidence. *Id.*, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-

No. 15AP-1102

Ohio-2179, paragraph two of the syllabus. Sufficiency is a term of art " 'which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' * * * In essence, sufficiency is a test of adequacy." *Eastley* at ¶ 11, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The weight of the evidence concerns " 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict.' " (Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387. The weight of the evidence " 'is not a question of mathematics, but depends on its *effect in inducing belief*.' " (Emphasis sic.) *Id.*

{¶ 21} We recently explained our approach to manifest weight of the evidence as follows:

> In addressing a manifest weight of the evidence argument, we are able to consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting our review, we are guided by the presumption that the jury, or the trial court in a bench trial, " 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Accordingly, we afford great deference to the jury's determination of witness credibility. *State v. Redman*, 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26, citing *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 55. *See also State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus (credibility determinations are primarily for the trier of fact).

*State v. Sims*, 10th Dist. No. 14AP-1025, 2016-Ohio-4763, ¶ 17.

{¶ 22} To establish actionable negligence, Quaye was required to prove the existence of a duty, a breach of that duty, and injury resulting proximately from the breach. *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989). The existence of a duty is a question of law for the court to determine. *Id.* at 318. A defendant's duty to a plaintiff depends on the relationship between the parties and the foreseeability of injury to someone in the plaintiff's position. *McCoy v. Kroger Co.*, 10th Dist. No. 05AP-7, 2005-Ohio-6965, ¶ 7; *Menifee v. Ohio Welding Prods.*, 15 Ohio St.3d 75, 77 (1984). "The test for foreseeability is

whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." *Menifee* at 77. " 'Only when the injured person comes within the circle of those to whom injury may reasonably be anticipated does the defendant owe him a duty of care.' " *Jeffers v. Olexo*, 43 Ohio St.3d 140, 142 (1989), quoting *Gedeon v. E. Ohio Gas Co.*, 128 Ohio St. 335, 338 (1934).

{¶ 23} Furthermore, " 'negligence is without legal consequence unless it is a proximate cause of an injury.' " *Whiting v. Ohio Dept. of Mental Health*, 141 Ohio App.3d 198, 202 (10th Dist.2001), quoting *Osler v. Lorain*, 28 Ohio St.3d 345, 347 (1986). Proximate cause "is generally established where an original act is wrongful or negligent and, in a natural and continuous sequence, produces a result that would not have taken place without the act." *Whiting* at 202. "[B]efore finding in a party's favor on a negligence claim, a fact finder must be persuaded of each element of the claim by a preponderance of the evidence." *Brothers v. Morrone-O'Keefe Dev. Co., L.L.C.*, 10th Dist. No. 05AP-161, 2006-Ohio-1160, ¶ 20.

{¶ 24} The court heard the conflicting evidence about how the incident occurred, and concluded that it was more likely that Quaye entered the closet after Davis had already ascended the ladder. *See State v. Eisenman*, 10th Dist. No. 10AP-809, 2011-Ohio-2810, ¶ 19 (noting that "[i]t is the province of the fact finder to determine the truth from conflicting evidence, whether the conflicting evidence comes from different witnesses or is contained within the same witness's testimony"). As the trial court was in the best position to observe the witnesses' demeanors as they testified, we defer to the trial court's beliefs of their testimony and observations on credibility. *Sims* at ¶ 17. *See also Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 25} The record supports the trial court's conclusion that Quaye's version of the accident seemed to lack critical details. Quaye's version required the court to believe that Davis never noticed Quaye, and that Quaye never said anything to Davis, throughout the entire time that Davis entered a small janitor's closet, set up a ladder, climbed up the ladder, and removed two fluorescent tube light bulbs. Notably, Quaye admitted that the accident affected his memory and caused him to "forget things fast." (Tr. at 80.)

{¶ 26} On appeal, Quaye asserts that Davis was negligent in failing to block off the area before changing the light bulbs. Quaye states that "Davis clearly did not follow his own

safety precautions by 'blocking off' the area before he started changing the light bulbs," and asserts that, if "Davis had 'blocked off' the area before attempting to change the light bulbs, [Quaye] would not have been hit by a falling object." (Appellant Brief at 12.)

{¶ 27} But Quaye did not argue this to the trial court. This argument also tends to support Davis' version of the facts, that Quaye entered the closet after Davis had begun to change the bulb. Quaye asserted in his complaint that Davis failed to use ordinary care in replacing the fluorescent bulb, and asserted at trial that Davis had negligently set up the ladder and attempted to replace the light bulbs while Quaye was gathering rags on the ground underneath the ladder. Quaye's attorney argued in closing that the "general safety rule" that everyone "agreed upon" was that "whenever you're doing overhead work you need to make sure that if anybody's below there, they need to be protected or removed from the area." (Tr. at 174.) Counsel asserted that Davis was negligent because he was "working over [Quaye's] head." (Tr. at 192.) Quaye did not at any point argue to the trial court that Davis was negligent in failing to block off the area before changing the light bulbs.

{¶ 28} An appellant cannot change the theory of his case and present new arguments for the first time on appeal. *State ex rel. Gutierrez v. Trumbull Cty. Bd. of Elections*, 65 Ohio St.3d 175, 177 (1992). *See also Clemens v. Nelson Fin. Group, Inc.*, 10th Dist. No. 14AP-537, 2015-Ohio-1232, ¶ 27. "These rules are deeply embedded in a just regard for the fair administration of justice," as they "afford the opposing party a meaningful opportunity to respond to issues or errors that may affect or vitiate his or her cause [and] do not permit a party to sit idly by until he or she loses on one ground only to avail himself or herself of another on appeal." *State ex rel. Quarto Mining Co. v. Foreman*, 79 Ohio St.3d 78, 81 (1997).

{¶ 29} By not presenting his current theory of relief to the trial court, Quaye deprived the trial court the opportunity to rule on this theory of the case, and prevented Davis from defending against this theory of liability. Accordingly, Quaye is not entitled to change the theory of his case on appeal.

{¶ 30} Even if we were to consider Quaye's new argument on appeal, the record does not support a finding of negligence on this theory that Davis failed to block off the area before he began his work. Davis affirmed that he takes certain safety precautions when using ladders at his job, testifying as follows:

No. 15AP-1102

A. I make sure and wait till everybody -- I make sure everything's out of -- everybody's out of the way before I block it off and everything and --

Q. And why is that?

A. Because we're -- so something won't fall down.

Q. In other words, you need to do that in order to prevent somebody from getting hurt by a falling object?

A. Yeah.

Q. And that's an important safety rule?

A. Yeah.

Q. That's something that you've known for the 35 years that you've been employed --

A. Yes.

Q. -- at the North Market?

A. Yeah.

Q. And is that something that you always do?

A. Yeah.

(Tr. at 21-22.)

{¶ 31} At his deposition, Davis explained that when he uses a ladder at the North Market, "sometimes [he] used to put cones and [he] used to block it off." (Davis Depo. at 23.) However, because the light at issue "was inside of a room, [Davis] didn't think it was necessary to block it off," as he didn't see anybody inside the room. (Davis Depo. at 23.) Davis noted that he "never thought somebody was going to go walking behind [him] when [he was] on top of a ladder." (Davis Depo. at 33.) Doersam observed that with the "ladder in place and that door open, that's taking up a pretty sizeable chunk of that room." (Tr. at 133-34.)

{¶ 32} In determining whether a reasonably prudent person in Davis' position should have perceived the risk of injury to another, "only those circumstances which they perceived, or should have perceived, at the time of their respective actions should be considered." *Menifee* at 77. As Davis did not see anyone in the closet, he had no reason to

No. 15AP-1102

believe that someone would attempt to walk into the small janitor's closet when a six-foot ladder was visibly set up inside the closet. Quaye's walking into the closet was not foreseeable.

{¶ 33} Furthermore, Quaye testified only that he was in the closet gathering rags when Davis entered the closet and set up the ladder. Thus, based on Quaye's testimony, cones blocking off the entrance to the closet would not have prevented the accident, as Quaye testified at trial that he was already inside the closet when Davis set up the ladder. And the trial court did not hear evidence such as if Quaye had seen a cone outside the closet, that it would have warned and deterred him from entering the closet. Thus even if Quaye's theory of negligence based on not blocking off the closet could be considered, he did not present evidence to demonstrate a causal connection between his injury and Davis' failure to block off the closet from entrance. *Compare Burth v. CPK Constr.*, 9th Dist. No. 22713, 2006-Ohio-70, ¶ 15; *Plank v. McKeever*, 10th Dist. No. 04AP-1273, 2005-Ohio-5645, ¶ 18 (observing that the "plaintiffs lost not because no one caused the accident, but because plaintiffs failed to meet their respective burdens to show, by a preponderance of the evidence, whose negligence was the proximate cause").

{¶ 34} Quaye's sole assignment of error is overruled and we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN and HORTON, JJ., concur.

———————————