[Cite as *Perez v. Crown Equip. Corp.*, 2022-Ohio-4761.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

CHRISTIE PEREZ NKA ROWE,

    PLAINTIFF-APPELLANT,               CASE NO.  1-22-26

    v.

CROWN EQUIPMENT CORPORATION,
ET AL.,                                  O P I N I O N

    DEFENDANTS-APPELLEES.

Appeal from Allen County Common Pleas Court
Trial Court No.  CV2019 0164

**Judgment Affirmed**

**Date of Decision:   December 29, 2022**

APPEARANCES:

    *Kevin J. Boissoneault* for Appellant

    *Jeffrey T. Cox* for Appellees

Case No. 1-22-26

**MILLER, J.**

{¶1} Plaintiff-appellant, Christie Perez, now known as Christie Rowe,[1] appeals the March 17, 2022 judgment of the Allen County Court of Common Pleas granting the motion for summary judgment of defendants-appellees, Crown Equipment Corporation, Crown Lift Trucks-Dayton, and Crown Lift Trucks-Northern Kentucky (collectively "Crown"). For the reasons that follow, we affirm.

## I. Facts & Procedural History

{¶2} On April 27, 2017, Rowe was at work at the Delphos, Ohio facility of her employer, Lakeview Farms, LLC. Lakeview, a manufacturer of dips, desserts, and other specialty food products, employed Rowe as a material handler in one of its cold storage warehouses. Rowe was assigned to work through Dock Door #15—a one-piece, vertical-lift overhead door weighing some 500 pounds. That morning, Lakeview employees, including Rowe, reported that Dock Door #15 appeared to be damaged. The employees indicated that one of the two cables used to lift Dock Door #15 was "hanging loose" and that Dock Door #15 was difficult to open. Notwithstanding these complaints, Rowe continued to work at her assigned position at Dock Door #15. At approximately 2:45 p.m., Dock Door #15 suddenly and unexpectedly fell on Rowe, pinning her to the ground. Rowe sustained several serious injuries, including multiple spinal fractures and broken ribs.

---

[1] Throughout this opinion, we will refer to appellant by her current name, Christie Rowe.

-2-

{¶3} On April 26, 2019, Rowe filed a complaint in the trial court naming Lakeview and various other parties, including numerous John Does, as defendants.[2] Rowe's complaint set forth a claim for negligence against Crown. Rowe's claim against Crown was based on an allegation that Crown negligently performed under a Planned Maintenance Agreement ("PM Agreement") it entered into with Lakeview in February 2016. Under the terms of the PM Agreement, Crown was obligated to conduct semi-annual inspections of some of the dock doors at Lakeview's warehouse, including Dock Door #15. Prior to the date of the incident, Crown had last examined Dock Door #15 pursuant to the PM Agreement on December 22, 2016, at which time Crown's technician indicated that the components of Dock Door #15 were "OK" and documented no issues calling for repair or further maintenance. In her complaint, Rowe averred that Crown "breached their duty of care to carefully inspect and maintain [Dock Door #15] * * * when just four months after their last inspection * * * both door cables or cable system failed during regular use, causing the door to free fall on [her] and injure her." On April 29, 2019, Rowe filed an amended complaint, which Crown answered on May 30, 2019.

{¶4} On January 10, 2022, Crown filed a motion for summary judgment on Rowe's negligence claim. On February 22, 2022, Rowe filed a memorandum in

---

[2] Of these parties, only Crown and Lakeview remained as defendants at the time of the trial court's summary judgment decision.

opposition to Crown's motion for summary judgment. To support her opposition to Crown's motion for summary judgment, Rowe relied on an affidavit and expert report from Kenneth D. Martin, who held himself out as a "door and gate expert" and who Rowe retained as a consultant. In his affidavit, Martin opined that "evidence of safety-related issues and damage to the hardware on [Dock Door #15] would not have been readily apparent to a casual observer but should have and would have been apparent during a careful inspection by a door professional such as Crown in December 2016." In his affidavit and report, Martin asserted that the substandard condition of Dock Door #15, which went unremediated due to Crown's negligent inspection, caused the door to fall on Rowe. Martin further faulted Crown for failing to recommend that Dock Door #15 be replaced with a safer door, failing to install or recommend installation of safety equipment such as an anti-fall device or an electric operator, and failing to place or recommend placement of warning placards. On March 8, 2022, Crown filed a reply in support of its motion for summary judgment.

{¶5} On March 17, 2022, the trial court granted Crown's motion for summary judgment.[3] While acknowledging the PM Agreement, the trial court concluded that "as a matter of law, Crown owed no duty to [Rowe]." Moreover, the

_____

[3] On January 10, 2022, Lakeview moved for summary judgment on the claim Rowe had brought against it. The trial court granted Lakeview's motion for summary judgment at the same time and in the same entry as it granted Crown's motion for summary judgment. In this appeal, Rowe does not assign error with respect to the trial court's decision to grant Lakeview's motion for summary judgment.

trial court held that "[e]ven if there was enough evidence to create a genuine issue of fact regarding whether Crown owed a duty to [Rowe] (which the Court finds there is not), Crown has pointed to a lack of evidence to demonstrate a genuine issue as to whether it breached any duty to [Rowe]." Finally, the trial court concluded that there was no evidence that "anything Crown did under the [PM Agreement] with Lakeview proximately resulted in injury to [Rowe]."

## II. Assignment of Error

{¶6} On April 13, 2022, Rowe timely filed a notice of appeal. She raises the following assignment of error for our review:

**The trial court erred when it granted summary judgment in favor of Crown Equipment Corporation, Crown Lift Trucks-Dayton, and Crown Lift Trucks-Northern Kentucky.**

## III. Discussion

{¶7} In her assignment of error, Rowe argues that the trial court erred by granting Crown's motion for summary judgment. Rowe claims that (1) the trial court was wrong to conclude that Crown did not owe her a duty, (2) the trial court incorrectly determined that there was no genuine issue of material fact that Crown did not breach its duty, if any, to her, and (3) the trial court erred by concluding that there was no genuine issue of material fact that her injuries were not proximately caused by Crown's conduct.

### A. Summary-Judgment Standard of Review

{¶8} We review a decision to grant summary judgment de novo. *Doe v. Shaffer*, 90 Ohio St.3d 388, 390 (2000). "De novo review is independent and without deference to the trial court's determination." *ISHA, Inc. v. Risser*, 3d Dist. Allen No. 1-12-47, 2013-Ohio-2149, ¶ 25.

{¶9} Summary judgment is proper where there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party. Civ.R. 56(C); *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 69 Ohio St.3d 217, 219 (1994). Material facts are those facts "'that might affect the outcome of the suit under the governing law.'" *Turner v. Turner*, 67 Ohio St.3d 337, 340 (1993), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). "Whether a genuine issue exists is answered by the following inquiry: Does the evidence present 'a sufficient disagreement to require submission to a jury' or is it 'so one-sided that one party must prevail as a matter of law[?]'" (Bracketing in original.) *Id.*, quoting *Anderson* at 251-252.

{¶10} "The party moving for summary judgment has the initial burden of producing some evidence which demonstrates the lack of a genuine issue of material fact." *Carnes v. Siferd*, 3d Dist. Allen No. 1-10-88, 2011-Ohio-4467, ¶ 13, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). "In doing so, the moving party is

not required to produce any affirmative evidence, but must identify those portions of the record which affirmatively support his argument." *Id.*, citing *Dresher* at 292. "The nonmoving party must then rebut with specific facts showing the existence of a genuine triable issue; he may not rest on the mere allegations or denials of his pleadings." *Id.*, citing *Dresher* at 292 and Civ.R. 56(E).

**B. The trial court did not err by granting Crown's motion for summary judgment.**

{¶11} At the center of this appeal is Rowe's negligence claim against Crown. "To establish a cause of action for negligence, a plaintiff must show the existence of a duty, breach of that duty, and an injury proximately caused by the breach." *Daley v. Fryer*, 3d Dist. Allen No. 1-14-48, 2015-Ohio-930, ¶ 16. To defeat a defendant's properly supported motion for summary judgment in a negligence action, the plaintiff must first establish that the defendant owed him a duty. *Id.* "The plaintiff must then present evidence from which reasonable minds could conclude that the defendant breached that duty and that the breach was the proximate cause of the plaintiff's injuries." *Id.* Having reviewed the evidentiary materials submitted in support of and in opposition to Crown's motion for summary judgment, we conclude that while Rowe established that Crown owed her a duty, Rowe failed to present evidence from which reasonable minds could conclude that Crown's breach of that duty, if any, proximately caused her injuries.

**i. Crown owed a duty to Rowe.**

{¶12} "Duty is a threshold question in a negligence case." *Martin v. Lambert*, 4th Dist. Meigs No. 12CA7, 2014-Ohio-715, ¶ 16. "Generally, '[a] defendant's duty to a plaintiff depends on the relationship between the parties and the foreseeability of injury to someone in the plaintiff's position.'" (Bracketing in original.) *A.M. v. Miami Univ.*, 10th Dist. Franklin No. 17AP-156, 2017-Ohio-8586, ¶ 33, quoting *Quaye v. N. Mkt. Dev. Auth.*, 10th Dist. Franklin No. 15AP-1102, 2017-Ohio-7412, ¶ 22. "'If there is no duty, then no legal liability can arise on account of negligence. Where there is no obligation of care or caution, there can be no actionable negligence.'" *Jeffers v. Olexo*, 43 Ohio St.3d 140, 142 (1989), quoting 70 Ohio Jurisprudence 3d, Negligence, Section 13, at 53-54 (1986). "The existence of a duty is a question of law for a court to decide, even if resolving that question requires the court to consider the facts or evidence." *Martin* at ¶ 17.

{¶13} In its entry granting Crown's motion for summary judgment, the trial court stated that "[l]iability in this case is predicated on a theory of *nonfeasance*, to wit: Crown's negligent failure to carefully inspect and maintain [Dock] Door #15, as Crown was required to do under the maintenance agreement with Lakeview." (Emphasis sic.). "'Nonfeasance is the omission of an act which a person ought to do * * *.'" *Estate of Ciotto v. Hinkle*, 6th Dist. Huron No. H-18-011, 2019-Ohio-3809, ¶ 48, quoting *State ex rel. Neal v. State Civ. Serv. Comm.*, 147 Ohio St. 430, 434 (1947). Nonfeasance is to be contrasted with "misfeasance," which is "'the

improper doing of an act which a person might lawfully do * * *.'" *Id.*, quoting *State ex rel. Neal* at 434. "The law imposes a duty to refrain from active misconduct that causes a positive injury to others, but does not impose a duty to take affirmative action to aid or protect another." *Homan v. George*, 127 Ohio App.3d 472, 475 (10th Dist.1998). Rather, a person will generally be held liable for their failure to affirmatively act for the protection or assistance of another "only if the defendant shares a 'special relation' with the plaintiff or the third person that justifies the imposition of [a] duty." *Phillips v. Am. Elec. Power Co.*, 7th Dist. Jefferson No. 10 JE 13, 2011-Ohio-6731, ¶ 34. "Relationships which result in a duty to protect others include (1) common carrier and its passengers, (2) innkeeper and guests, (3) possessor of land and invitee, (4) custodian and individual taken into custody, and (5) employer and employee." *Jackson v. Forest City Ent., Inc.*, 111 Ohio App.3d 283, 285 (8th Dist.1996), citing Restatement of the Law 2d, Torts, Section 314(A) (1965).

{¶14} But here, the existence of one of these special relationships between Crown and Rowe is not dispositive of whether Crown owed a duty to Rowe.[4] "As

---

[4] Nor is the traditional distinction between nonfeasance and misfeasance particularly helpful in determining whether Crown owed a duty to Rowe or in defining the scope of any such duty. Some of the negligent conduct alleged by Rowe, such as Crown's failure to recommend that Dock Door #15 be retired and replaced or Crown's failure to install an anti-fall device on Dock Door #15, can more readily be characterized as nonfeasance. However, the gravamen of Rowe's claim—that Crown was negligent in inspecting Dock Door #15 and in failing to report the (undetected) problems with Dock Door #15 to Lakeview—defies easy categorization as either nonfeasance or misfeasance. Indeed, as the New York Court of Appeals has explained: "[T]he line between misfeasance and nonfeasance is difficult to draw. This is especially so in cases * * * involving contracts to inspect or maintain. An inspection that fails to uncover a defect could be labeled either misfeasance for negligent performance of the inspection or nonfeasance for failure to conduct

Case No. 1-22-26

a general rule, if a plaintiff brings an action sounding in tort and bases his claim upon a theory of duty owed by a defendant as a result of contractual relations, he must be a party or privy to the contract in order to prevail." *Vistein v. Keeney*, 71 Ohio App.3d 92, 106 (11th Dist.1990). However,

> [w]here one, under a written contract, undertakes to service and examine the mechanical equipment of another and make a report on the condition thereof, and the equipment is of such a nature as to make it reasonably certain that life and limb will be endangered if such work is negligently performed, he is chargeable with the duty of performing the work in a reasonably proper and efficient manner, and if such duty is negligently or carelessly performed whereby injury occurs to a blameless person, not a party to the contract and lawfully using such equipment, such injured person has a right of action directly against the offending contractor. Liability in such instance is not based upon any contractual relation between the person injured and the offending contractor, but upon the failure of such contractor to exercise due care in the performance of his assumed obligations.[5]

---

some procedure that would have revealed the defect." (Citations omitted.) *Eaves Brooks Costume Co., Inc. v. Y.B.H. Realty Corp.*, 76 N.Y.2d 220, 226 (1990).

[5] We note a similar rule is found in Section 324A of the Second Restatement of the Law of Torts. Under the rule propounded there,

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

While the Supreme Court of Ohio has not adopted the rule set forth in Section 324A, it has not foreclosed its application in Ohio. *See Hill v. Sonitrol of Southwestern Ohio, Inc.*, 36 Ohio St.3d 36, 42-43 (1988). The rule has been embraced by at least two of our sister courts of appeals. *See Stevens v. Jeffrey Allen Corp.*, 131 Ohio App.3d 298, 304-305 (1st Dist.1997); *Root v. Stahl Scott Fetzer Co.*, 8th Dist. Cuyahoga No. 104172, 2017-Ohio-8398, ¶ 34-40.

-10-

*Durham v. Warner Elevator Mfg. Co.*, 166 Ohio St. 31 (1956), paragraph two of the syllabus. Under this theory of liability, "by agreeing to perform certain services pursuant to a contract, the service provider has assumed the affirmative duty to exercise ordinary care to avoid injury to others as a result of its execution of its contractual duties." *Jones v. Action Now Pest Control*, 7th Dist. Harrison No. 08 HA 6, 2010-Ohio-1543, ¶ 15.

**{¶15}** "Outside the general legal duty of all people not to injure others through willful or wanton misconduct, the scope of the service provider's duty to the third party is limited, as a matter of law, by the agreement between the contracting parties." *Id.* at ¶ 16. "A service provider does not have a duty to third parties to act outside the scope of their contract, even if such action could have prevented injury." *Id.* "Moreover, 'the mere omission to perform a contract obligation is never a tort unless the omission is also the omission to perform a legal duty.'" *Id.*, quoting *Nationwide Mut. Fire Ins. Co. v. Sonitrol, Inc. of Cleveland*, 109 Ohio App.3d 474, 485 (8th Dist.1996).

As relevant here, the PM Agreement provided:

Properly working docks and doors can increase your productivity, offer a safer environment for you [sic] workers and reduce or eliminate costly repairs cased [sic] by abuse or neglect. Crown's Planned Maintenance Programs offers [sic] you peace of mind, assuring you that your docks and doors are fully functioning when you need them most. Let Crown take care of your loading dock needs.

We propose the following to be included in our PM.

DOORS
WE SERVICE ALL TYPES OF DOORS
MINOR ADJUSTMENTS ARE INCLUDED IN THIS PRICE
- DISCUSS DOOR OPERATIONS WITH WAREHOUSE PERSONNEL TO GATHER FURTHER OPERATION INFORMATION
- LUBRICATE MAIN SPRINGS, AND RE-ADJUST IF NEEDED
- LUBRICATE ROLLERS AND BEARINGS
- INSPECT DOOR ALIGNMENT, AND DOOR PANELS
- INSPECT HINGES AND HARDWARE
- INSPECT SPRING MOUNTINGS
- INSPECT CABLES, DRUMS, WEATHERSEALS, LOCKS AND TRACK FASTNERS [sic]

* * *

While doing the regularly scheduled PM, our technicians make note of any situations that are safety or maintenance related. Additional work is done on a time and material basis, or quoted and completed only with your approval.

(Capitalization sic.).

{¶16} Looking at the PM Agreement, as well as Crown's and Rowe's other evidentiary submissions, several things are clear. First, Dock Door #15, which Crown agreed to inspect and service as outlined by the terms of the PM Agreement, was "of such a nature as to make it reasonably certain that life and limb w[ould] be endangered if such work [was] negligently performed." *Durham*, 166 Ohio St. 31, at paragraph two of the syllabus. It cannot be seriously disputed that a 500-pound overhead door suspended several feet above a frequently trafficked area poses a substantial risk of serious injury to those passing beneath the door if it is negligently

-12-

maintained or serviced. Crown recognized as much when it included in its PM Agreement a statement that "[p]roperly working * * * doors * * * offer a safer environment for you [sic] workers." Furthermore, from the summary-judgment evidence, it is plain that Rowe was the type of person to whom a duty would be owed under the *Durham* rule—"a blameless person, not a party to the contract and lawfully using such equipment." *Id.* Therefore, we conclude that under the rule announced in *Durham*, Crown was charged with a duty to Rowe.

{¶17} Crown's duty to Rowe was, however, sharply constrained by the clear and unambiguous terms of the PM Agreement. Under the PM Agreement, Crown was required to discuss "door operations" with Lakeview warehouse personnel to collect information about how the doors in the warehouse operated. Crown also had a contractual duty to lubricate several specifically listed components of Dock Door #15, inspect a number of other specifically listed components of Dock Door #15, and make minor adjustments to these specific components of Dock Door #15 as needed. Finally, Crown had a contractual duty to make note of "safety or maintenance related" issues discovered during the course of the inspection and planned maintenance of Dock Door #15, which, upon being reported to Lakeview, would be repaired by Crown only with Lakeview's approval.

{¶18} Pointing to this last provision of the PM Agreement, Rowe has argued that Crown was required to make note of and take action to neutralize *any* safety-

related issue with Dock Door #15. In Rowe's view, Crown was thus obligated to ensure that the door at Dock #15 existed in the safest possible condition by noting the lack of safety devices and warning placards on Dock Door #15 and insisting on their installment or perhaps by even replacing the allegedly obsolete Dock Door #15 with a newer, safer model. But this is clearly not what was required of Crown under the terms of the PM Agreement. While the PM Agreement did say that Crown was to take note of "any situations that [were] safety or maintenance related," this obligation was linked explicitly to the "regularly scheduled PM" and thus plainly required Crown to note only those safety or maintenance issues detected in the specific existing door components it had agreed to inspect and maintain. Crown otherwise had no responsibility under the PM Agreement to recommend or guarantee a safer door system. *See Jones*, 2010-Ohio-1543, at ¶ 24 (rejecting plaintiff's argument that defendant's status as an "expert on bat exclusion * * * create[d] a legal duty to perform an unrequested interior inspection for bat guano" and holding that defendant had no duty to enter into a more comprehensive contract or to perform or recommend services outside the scope of the contract, even if they would have reduced the possibility of plaintiff's injury).

{¶19} Rowe further claims that "[i]ncluded in [the] PM Agreement is that if something is noticeably wrong with [Dock Door #15], * * * Crown will repair it." (Appellant's Brief at 14). She also maintains that because "the PM Agreement is

designed to prevent issues that may arise in the equipment[,] * * * Crown [is] therefore responsible for replacing or repairing parts before they break." (Appellant's Brief at 14). Yet, no such obligations existed under the PM Agreement. The PM Agreement is clear that, aside from minor adjustments, Lakeview's approval was required before Crown would undertake to repair Dock Door #15. Crown would have had a duty of reasonable care in completing any such repairs requested by Lakeview, but contrary to Rowe's assertion, Crown did not have a freestanding obligation to repair Dock Door #15 or replace its defective parts.

{¶20} In sum, Crown's door-related obligations under the PM Agreement were limited to the following: (1) discussing "door operations" with Lakeview warehouse personnel to learn more about how the warehouse doors functioned; (2) lubricating the main springs, rollers, and bearings; (3) inspecting the door alignment, door panels, hinges, hardware, spring mountings, cables, drums, weather seals, locks, and track fasteners; (4) making minor adjustments to these specific door components, if needed; (5) making note of any safety or maintenance related issues detected in these specific door components during the inspection; and (6) upon Lakeview's request, replacing parts or making repairs to resolve the safety or maintenance related issues noted during the inspection. Crown was obligated to do these six things, and nothing more. Under the circumstances, Crown had a duty to Rowe to exercise reasonable care in discharging these obligations that it had

assumed under the PM Agreement. The question now is whether there is a genuine issue of material fact that Crown failed to exercise such reasonable care in performing under the PM Agreement, thereby breaching its duty to Rowe, and, if so, whether there is a genuine issue of material fact that Crown's breach was the proximate cause of Rowe's injuries.

**ii. Rowe did not demonstrate that there is a genuine issue of material fact that her injuries were proximately caused by Crown's failure to exercise due care in performing its obligations under the PM Agreement.**

{¶21} We begin with the issue of breach. Crown supported its motion for summary judgment with evidence indicating that its technician had inspected Dock Door #15 on December 22, 2016, and found nothing wrong with it and that Dock Door #15 functioned normally from the time of the inspection until just hours before the incident on April 27, 2017. Crown's technician, Alvin Cox, testified in deposition that he had over 30 years' experience as an overhead door installer and repairman. (Cox Depo. Tr. at 9-11, 40). He stated that when he began working for Crown, he successfully completed several training modules relating to inspecting and maintaining overhead doors. (Cox Depo. Tr. at 11-14).

{¶22} Cox testified that during door inspections, "I'll oil everything that I need to oil and usually when I do that, when I oil something that's when I can check it to make sure it's okay * * *." (Cox Depo. Tr. at 19). He further testified that when he inspects and services a door for the first time, as was the case with Dock

Door #15, he "always go[es] up and check[s] to make sure everything is good to go and oil the springs." (Cox Depo. Tr. at 27-28). Cox stated that during his inspections, he checks the cables for fraying and applies oil to the cables near where they are connected to the door, though he does not run his fingers up and down the entire length of the cables. (Cox Depo. Tr. at 31-32, 49, 64). He also testified that during an inspection he goes up one side of the door, comes down, and goes up the other side of the door. (Cox Depo. Tr. at 39-40). Cox stated, "[I] [c]ome down and then I oil everything, bearings, springs, provided that it needs it." (Cox Depo. Tr. at 40). Cox stated that during his inspection of Dock Door #15, he did not "do anything differently that [he] would otherwise [have done] on a [Planned Maintenance inspection]." (Cox Depo. Tr. at 42). During his December 22, 2016 inspection of Dock Door #15, Cox completed a checklist of "Inspection Items." Per Cox's checklist, Cox found the following to be "OK" during his inspection: "Inspect Sections," "Inspect & Adjust Door Alignment," "Inspect & Lube Rollers & Bearings," "Lube & Adjust Springs," "Inspect Cables," "Inspect Drums," "Inspect Locks," "Inspect Track Fasteners & Hangers," "Inspect Weatherseal," and "Inspect Hinges & Hardware." (Crown's Motion for Summary Judgment, Ex. S).

{¶23} Following Cox's inspection, Dock Door #15 functioned without incident until the morning of April 27, 2017. Several Lakeview employees testified in deposition that they were not aware of any issues with Dock Door #15 prior to

-17-

the incident and that no one had reached out to report any issues to Crown because there were none to report. (Michael Kayser Depo. Tr. at 12, 22-23); (Brian Buettner Depo. Tr. at 9, 30). In fact, Rowe's expert, Martin, whose report Crown actually submitted with its motion for summary judgment, indicates that video footage from Lakeview's warehouse showed Dock Door #15 opening and closing smoothly and "glid[ing] to floor easily" at 11:54 p.m. on the night before the incident, with no serious deterioration in Dock Door #15's functioning until 9:38 a.m. (Martin Report at 35-37). With the foregoing evidence, Crown sustained its initial burden of demonstrating the lack of a genuine issue of material fact that it fully performed its obligations under the PM Agreement and that it did so with reasonable care. *See Hickey v. Otis Elevator Co.*, 163 Ohio App.3d 765, 2005-Ohio-4279, ¶ 31 (10th Dist.) (defendant carried its summary-judgment burden with affidavit averring that its "qualified mechanics performed regularly scheduled maintenance on the elevator in question, in accordance with [its] contractual obligations, and found no problems with the buttons" and that defendant's mechanics were never given notice of any problems with the buttons).

{¶24} In response to Crown's motion for summary judgment, Rowe pointed to Martin's report to show that there are genuine issues of material fact regarding whether Crown breached its duty. Martin's report contains numerous statements impugning the quality and thoroughness of Cox's inspection. Martin states that he

"could find no evidence that [Crown was] qualified to work on [Dock Door #15]." (Martin Report at 5). He faults Crown for, among other things, "using sectional door checklists for one-piece door preventative maintenance inspections," which, according to Martin, "omit[] many (if not most) critical items for the safety of those doors, and included many irrelevant items such as hinges, door operators, etc." (Martin Report at 23). Martin suggests that Crown's lack of qualifications led it to miss the problems with Dock Door #15. He states that "at the time of the Incident, [Dock Door #15] was in a seriously neglected state." (Martin Report at 7). He further states that "the bottom of the track on both sides was damaged, torn and dented." (Martin Report at 12). Martin also indicates that the "track stabilizing angle"[6] was "badly bent and damaged" and that at the time of his site inspection, Dock Door #15 and most of its parts "were damaged, shredded, dry, rusty, and worn" and "badly in need of maintenance and repair." (Martin Report at 13-14, 33). In addition, Martin observes: "At the time of our inspection, Door #15 was in extremely poor condition. * * * Photos from 2017 show a similar state of disrepair. * * * Tracks were dented and damaged. The front of the door slab was scraped badly. The weather seals were damaged." (Martin Report at 27). Martin concludes that "[t]he subject Door system was unreasonably hazardous at the time of the

---

[6] Overhead doors such as Dock Door #15 move along two parallel vertical tracks as they are raised and lowered. The track stabilizing angle is a long piece of metal that spans the space between the two vertical tracks. The track stabilizing angle is affixed to both tracks and helps to fortify the track structure.

Incident and * * * [t]he Door and its parts were broken, damaged, worn, frayed and unsafe for use." (Martin Report at 38).

{¶25} The problems with Martin's report are manifold. To begin, Martin doubts Crown's qualifications to inspect and service equipment like Dock Door #15 and he criticizes Crown for performing a different and less thorough inspection than he would have performed, but he offers few opinions concerning the matter actually at issue—whether Crown failed to exercise due care while doing the inspection it *did* agree to perform, i.e., the one called for by the PM Agreement. By and large, Martin's observations do not relate specifically to the PM Agreement or to Crown's performance thereunder. But more significantly, insofar as Martin can be understood as opining that the condition of Dock Door #15 was such that its defects should have been discovered during even the limited inspection required by the PM Agreement, this opinion is, for the most part, of no value. With the exception of Martin's observations about Dock Door #15's lift cables, which will be addressed below, Martin's findings about the condition of Dock Door #15 are based on photographs taken shortly after the incident on April 27, 2017, and on an in-person inspection of Dock Door #15 on January 20, 2021. Consequently, Martin's findings about Dock Door #15 are based on observations of its condition at these two points in time, with no attempt to show a continuity of condition stretching back to the December 22, 2016 inspection. That Dock Door #15 and its components were seen

to be damaged or in a state of disrepair four months, let alone four years, after Crown last inspected Dock Door #15 on December 22, 2016, does not establish that Dock Door #15 was in the same or even a similar state on the date of the inspection. For Crown to have breached its duty to Rowe, the damage and other issues with Dock Door #15 documented by Martin must have existed as of the date of Crown's inspection and been overlooked or unreported by Crown. As Martin's observations generally do not speak to the condition of Dock Door #15 on the date of the inspection, they do not rebut the evidence that the inspected components of Dock Door #15 were "OK" as of the December 22, 2016 inspection.

{¶26} Martin's affidavit, which Rowe also submitted to oppose Crown's motion for summary judgment, fares little better than his report. Martin's affidavit contains a statement that "evidence of safety-related issues and damage to the hardware on the subject door * * * should have and would have been apparent during a careful inspection by a door professional such as Crown in December 2016." (Martin Affidavit at ¶ 15). Martin supports this statement with a reference to Cox's deposition testimony that Dock Door #15 "was a little hard to lift." (Martin Affidavit at ¶ 15a); (Cox Depo. Tr. at 29). Martin avers that, in proper condition, Dock Door #15 "would lift smoothly" and that had "Cox investigated why the door was not opening smoothly he would have found the substandard condition of the cables and guides and that the door was not properly aligned." (Martin Affidavit at

-21-

¶ 15a). However, this conclusion is possible only if Cox's statement is taken out of context. Cox's statement was elicited during the following line of questioning:

> [Counsel]: All right. Tell me how dock door number 15 works at Lakeview Farms.
>
> [Cox]: It works pretty good. It was a little hard to lift. Other than that it worked pretty good. It balanced pretty good.

(Cox Depo. Tr. at 29). Therefore, as Cox's statement was given in answer to a question lacking any timeframe limitation, it is uncertain whether Cox was describing the functioning of Dock Door #15 on the date of his inspection or whether he was describing its functioning at some later time. As there is no clear indication that Dock Door #15 was "a little hard to lift" during the December 22, 2016 inspection, there is no factual support for Martin's opinion that Cox "would have found the substandard condition of the cables and guides and that the door was not properly aligned" during his inspection.

{¶27} Although Martin's report and affidavit are, for the most part, insufficient to create a genuine issue of material fact as to whether Crown breached its duty of reasonable care in performing its obligations under the PM Agreement, there is one area in which Martin's report and affidavit might introduce some question regarding Crown's performance of the PM Agreement and whether it breached its duty to Rowe. Specifically, in both his report and in his affidavit, Martin spends considerable time discussing the condition of Dock Door #15's lift

cables, both of which broke during the April 27, 2017 incident. Lakeview preserved the lift cables following the incident, and Martin examined them in formulating his opinions.

**{¶28}** In his report, Martin notes that both cables were looped at their top end and that the loops were used to attach the cables to their respective drums.[7] Martin states that loops "are never used to attach to drums in the door industry. The drum is designed only to accept button stops."[8] (Martin Report at 10). With respect to the bottom end of each cable, Martin notes that loops were also used to attach the cables to the top of the door but that there were no thimbles[9] placed in these loops. (Martin Report at 10). According to Martin, thimbles "help prevent breakage." (Martin Report at 10). Furthermore, Martin offers the following observations about the general state of the cables: "The Incident cables were badly fraying, which substantially weakens the breaking force of the cable. * * * Cables do not normally fray or wear out for many years. These cables showed signs of fraying with several of the steel strands broken. They had been fraying for a long period of time to get into that condition." (Martin Report at 10).

---

[7] The drums are two circular, tapered pieces of metal attached to a spring shaft above the door opening. They are placed to the inside of each of the vertical tracks, and each drum has grooves through which the lift cables are channeled. As the shaft turns to raise the overhead door, the drum itself turns, winding the lift cable around the drum. As the shaft turns to lower the overhead door, the drum turns in the opposite direction, unwinding the lift cable.

[8] In his report, Martin defined "button stop" as "[a] button stop swaged fitting at the end of the cable to prevent slippage through a slot in a drum." (Martin Report at 41).

[9] Thimbles are oval-shaped pieces of metal or plastic placed on the inside of a cable loop. According to Martin, "[t]himbles are used at the loop end of a wire rope or aircraft cable to prevent the cable from being sharply bent, and to reinforce the loop against wear." (Martin Report at 42).

{¶29} Later in his report, Martin opines that "[t]he cables had several defects that contributed to the Incident" and that they were "frayed and ready to fail." (Martin Report at 27). Specifically, he states:

> [I]t was extremely unlikely that the cables were exactly the same length because the loop end of the cable[s] had been hooked into the button-stop slot in the drum where they will not set correctly into the drum slots. * * * The two cables must be precisely the same length. They must have sufficient breaking strength[.] * * * [Dock Door #15's cables] were constructed improperly and it is unlikely they were sufficiently strong because they were badly frayed, and they were made with loops on both ends. The fact that they used loops makes it extremely unlikely for them to be identical length because the loop ends will not set correctly into the drum slots. * * * ***Crown inspected the cables on this Door in December of 2016, but obviously missed the problems with them.*** * * * Without button stops it is more likely cables will become unseated from the drums. It is my opinion that the loops on the ends of the cables caused the cables to be of different length. This situation would contribut[e] to a cable coming off the drum. * * * It is my opinion that the loops on the ends of the cables made it likely that the cables were not the same length which causes problems with the drum.

(Boldface and italicization sic.) (Martin Report at 27-28). Martin's affidavit contains similar conclusions. Specifically, Martin avers:

> Crown did not properly inspect the cables prior to the incident. * * * [T]hese cables did not have proper fittings and the cables do not decay over a period of four months meaning the cables were likely in the same condition in December 2016 as they were in April 2017.

(Martin Affidavit at ¶ 14b).

{¶30} Nonetheless, even assuming that Martin's report and affidavit are sufficient to create a genuine issue of material fact as to whether Crown breached

its duty to Rowe by failing to carefully and competently inspect and maintain Dock Door #15's lift cables, Rowe has failed to establish that this purported breach was the proximate cause of her injuries.  For a plaintiff to recover in a negligence action, they must ultimately prove that the defendant's act or omission was the "direct and proximate cause of the injury."  *Strother v. Hutchinson*, 67 Ohio St.2d 282, 286 (1981).  "Proximate cause" is "'often difficult of exact definition as applied to the facts of a particular case,'" but "'it is generally true that, where an original act is wrongful or negligent and in a natural and continuous sequence produces a result which would not have taken place without the act, proximate cause is established * * *.'"  *Id.* at 287, quoting *Clinger v. Duncan*, 166 Ohio St. 216, 217 and 223 (1957).

{¶31} Ordinarily, "the issue of proximate cause involves questions of fact and cannot be resolved by means of summary judgment."  *Welch v. Bloom*, 6th Dist. Lucas No. L-04-1003, 2004-Ohio-3168, ¶ 11.  Nevertheless, summary judgment should be granted on the issue of proximate cause if "'the plaintiff's evidence on the question of proximate cause is so meager and inconclusive that a finding of proximate cause would rest on speculation and conjecture[.]'"  (Bracketing in original.) *Bailey v. Ward*, 3d Dist. Logan No. 8-16-03, 2016-Ohio-7173, ¶ 45, quoting *Schutt v. Rudolph-Libbe, Inc.*, 6th Dist. Wood No. WD-94-064, 1995 WL 136777, *6 (Mar. 31, 1995).

{¶32} Here, in both his report and in his affidavit, Martin is emphatic that Dock Door #15 did not fall on Rowe because its lift cables failed and broke. Rather, Martin is of the opinion that the cables broke as Dock Door #15 was in the process of falling. As he explains in his affidavit:

> The cause of the incident was not broken cables. The cause of the incident was a falling door that broke the cables. A 500-pound garage door cannot break two 1/8" cables which, together, are rated at 3,400 pounds breaking strength unless the door is falling. The final page in my report shows that I hired a Professional Engineer to briefly demonstrate this simple principle: "when a 500-pound garage door is falling, the weight of the door is multiplied by the velocity of the fall, so the door needs to fall only a short distance before its downward force exceeds 3,400 pounds and both cables will snap like small strings." Neither of the cables broke before the incident. They both broke while the door was falling.

(Martin Affidavit at ¶ 7). He further states:

> [T]he probable cause of the door falling is that the door went out-of-level due to binding in the system * * *. When this type of door binds as it is opening or closing, one of the cables will become slack and can come unraveled from the drum. When one cable is off the drum, the door is being lifted by a single cable which exacerbates the out-of-level problem. When the door was lifted in that condition, the lifter would encounter resistance because the crooked, out-of-level door was binding as it was being raised between the two parallel and plumb tracks.

(Martin Affidavit at ¶ 8).

{¶33} Martin's report is consistent with these statements. In his report, Martin states that as Dock Door #15 fell, "the cables were tangled and snagged around the spring shaft so that the falling Door broke each of the cables * * *."

(Martin Report at 6). He explains that "the break was caused by violent stress causing the strands to yield (stretch) before breaking. This break was not caused by rubbing or being cut by the track or other sharp metal object." (Martin Report at 28). In a section of his report titled, "Could a Heavier Cable Stop the Falling Door? Probably Not," Martin elaborates:

> On a 500-pound door, it would take a VERY heavy cable to stop it during a freefall. The slightest velocity added to a 500-pound door exceeds the breaking strength of most Industry cables. The cable of the Door was a 1/8" cable which has 2000 pounds breaking strength. * * * BUT, because of the velocity of the falling Door, each taut cable may slow the Door, but the cables will still break.

(Capitalization sic.) (Martin Report at 29). At the conclusion of his report, Martin offers calculations supporting his assertions. (Martin Report at 63).

{¶34} In addition, Martin explains that "[p]rior to the Incident, the Door became jammed and at least one of the cables came off the drum and became unraveled." (Martin Report at 9). He continues:

> [I]f one side of the Door becomes jammed as it is opening or closing, that side of the Door will stop while the other side keeps moving. This action could cause a cable to come off the drum. At that point, the cables become tangled around the drums and/or the spring shaft. * * * When a door is opening or closing and one side of the Door becomes jammed, it is possible for the other side of the door to continue moving. When this happens, the Door will go out of level and the cable can come off the drum.

(Martin Report at 32).

**{¶35}** Thus, under Martin's theory of causation, most of the defects he faults Crown for supposedly failing to detect during the December 22, 2016 inspection—i.e., the fraying in Dock Door #15's lift cables and the lack of thimbles—were not responsible for Dock Door #15 falling on Rowe. Indeed, by representing that cables stronger and thicker than the 1/8" thick cables used with Dock Door #15 likely would not have prevented it from falling on Rowe, Martin has effectively conceded that Dock Door #15 would have fallen on Rowe even if Crown had swapped out Dock Door #15's lift cables with cables meeting Martin's more-demanding specifications. Consequently, if Crown did breach its duty to Rowe by failing to replace the fraying lift cables or install thimbles, as a matter of law, there is no genuine issue that Crown's breach was not the proximate cause of Rowe's injuries.

**{¶36}** Moreover, to the limited extent that Martin's report suggests that problems with Dock Door #15's lift cables might have been the proximate cause of Rowe's injuries, Martin's opinion is far too conjectural to create a genuine issue of material fact. Specifically, in his report, Martin concludes that Dock Door #15's lift cables were not the same length and that "[t]his situation would contribut[e] to a cable coming off the drum." (Martin Report at 28). He also states that it is "likely that the cables were not the same length which causes problems with the drum" and that the lack of button stops makes it "more likely cables will become unseated from the drums." (Martin Report at 28). However, Martin's conclusion about the lengths

of Dock Door #15's lift cables is based solely on the fact that loops, rather than button stops, were used to attach the cables to the drums. Martin infers, but does not know, that the cables were different lengths, and relying entirely on this inference, he speculates that the differing cable lengths were a possible cause or contributing factor in the cables slipping off their drums. Martin's opinion in this respect is conjecture heaped on conjecture and does not create a genuine issue of material fact as to proximate cause. *See Snay v. Burr*, 6th Dist. Huron No. H-19-016, 2020-Ohio-3828, ¶ 31 ("The 'piling' of inference upon inference, which amounts to impermissible speculation, does not create a material issue of fact to defeat summary judgment."); *Moore v. Ohio Valley Coal Co.*, 7th Dist. Belmont No. 05 BE 3, 2007-Ohio-1123, ¶ 45.

**{¶37}** Furthermore, these supposed cable defects were but one of no fewer than eight other causes identified by Martin as being potentially responsible for the binding that resulted in the cables slipping their drums, which in turn resulted in the door falling on Rowe. In his report, Martin represents that "[w]e do not yet know the exact source of the binding that led to the Incident" and that "[s]everal scenarios will be presented * * * that suggest possible ways this happened." (Martin Report at 14). Martin further explains, "Because this Incident occurred before my site inspections, I did not have the benefit of inspecting the Door as it existed at the time of the Incident. Therefore, I must use scenarios to suggest the most probable causes.

My site inspection did [give] clues as to possible causes of the binding." (Martin Report at 32). Martin then lists these possible causes, which include damage to the vertical tracks, wear in the rollers, an incompletely retracted locking mechanism, damage to the weather seal, and placement of debris, boxes, or other obstructions beneath the door. (Martin Report at 32-35).

**{¶38}** However, many of the possible causes proffered by Martin could have come into being as late as the morning of the April 27, 2017 incident, and Martin makes no attempt to clarify which of the causes was the probable cause or whether any of the causes were more probable than the others. Moreover, several of the possible causes identified by Martin, such as someone in Lakeview's warehouse placing a pallet of boxes underneath Dock Door #15 or someone in Lakeview's warehouse failing to completely retract Dock Door #15's lock bar, would be the result of forces totally outside of Crown's control and could not have been addressed or remedied during its December 22, 2016 inspection. "Where the damages are alleged to have been caused by a single tortfeasor, and the injury complained of may have resulted from any one of several causes, "'it is incumbent upon plaintiff to produce evidence which will exclude the effectiveness of those causes for which defendant is not legally responsible.'"" *Mid-Century Ins. Co. v. Stites*, 1st Dist. Hamilton No. C-200421, 2021-Ohio-3839, ¶ 15, quoting *Beaty v. Schilling*, 1st Dist. Hamilton Nos. C-880807 and C-890061, 1990 WL 14764, *2 (Feb. 21, 1990),

quoting *Gedra v. Dallmer Co.*, 153 Ohio St. 258 (1950), paragraph two of the syllabus. "[I]f the cause of an injury to a plaintiff may be as reasonably attributed to an act for which the defendant is not liable as to one for which he is liable, the plaintiff has not sustained the burden of proving that his injury is the direct result of the defendant's negligence." *Gedra* at 265. "If the plaintiff fails to eliminate equally valid theoretical causes for the actionable injury, 'the plaintiff would be asking the fact finder merely to speculate in his or her favor, a latitude the law does not grant.'" *Mid-Century Ins. Co.* at ¶ 16, quoting *Lonaker v. Cincinnati Youth Sports*, 1st Dist. Hamilton No. C-030672, 2004-Ohio-5993, ¶ 13, quoting *Loura v. Adler*, 105 Ohio App.3d 634, 638 (1st Dist.1995). Here, with Martin's report, Rowe urges us to do just that. Ultimately, Martin's speculative and inconclusive opinions about the cause of the binding in Dock Door #15 are, as a matter of law, insufficient to create a genuine issue of fact as to proximate cause.

{¶39} Finally, in his affidavit, Martin seemingly attempts to narrow the opinions of his report by asserting that the probable cause of the binding was "damage to the tracks or wear in the rollers." (Martin Affidavit at ¶ 8). However, Martin provides no explanation for why these two potential causes are more likely than the others noted in his report. Nor does he explain how he eliminated the other causes as being the agent responsible for causing the binding that eventually resulted in Rowe's injury. Consequently, this modified opinion lacks adequate factual

support and, as a result, is also insufficient to create a genuine issue of fact regarding the proximate cause of Rowe's injuries.

**{¶40}** Rowe's assignment of error is overruled.

### IV. Conclusion

**{¶41}** For the foregoing reasons, Rowe's assignment of error is overruled. Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Allen County Court of Common Pleas.

*Judgment Affirmed*

**ZIMMERMAN, P.J. and SHAW, J., concur.**

**/jlr**