[Cite as *Price v. H&M Landscaping Co., Inc.*, 2025-Ohio-2521.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| JONITA PRICE, ET AL., | : | |
| Plaintiffs-Appellants, | : | |
| | | No. 114332 |
| v. | : | |
| H&M LANDSCAPING CO., INC., ET AL., | : | |
| Defendants-Appellees. | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 17, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CV-22-971683 and CV-24-992012

---

### *Appearances:*

Condeni Law, LLC, and Joseph A. Condeni, *for appellants*.

Dickie, McCamey & Chilcote, P.C., and Kristin L. Wedell, *for appellees*.

EILEEN A. GALLAGHER, A.J.:

{¶ 1} Jonita and Ernest Price (collectively "Plaintiffs") appeal from the trial court's order granting summary judgment in favor of H&M Landscaping Co., Inc.,

and H&M Snow Pros, Inc. (collectively "H&M).  For the following reasons, we affirm the trial court's judgment.

## I.    Facts and Procedural History

{¶ 2} Plaintiffs own and reside in a condominium located at 4752 Walford Road, Suite 1, in Warrensville Heights (the "Condo").  AG Real Estate Group, Inc., and Clarkwood Townhome Condominium Assoc. #2 South ("collectively Clarkwood") maintain the condominium complex in which the Condo is located. Clarkwood hired H&M to perform snow removal and "ice melt services."

{¶ 3} On December 1, 2020, a winter storm hit Northeast Ohio depositing, on average, 9.5 inches of snow.  At approximately 7:00 a.m. on December 3, 2020, Plaintiffs exited the front door of the Condo.  It was still dark outside and there was a "blanket of snow" covering the front walkway.  Ernest successfully traversed the walkway but Jonita slipped and fell on the walkway in front of the Condo.  As a result of the fall, Jonita suffered a broken right ankle.

{¶ 4} On December 22, 2022, Plaintiffs filed a complaint against H&M and Clarkwood alleging negligence and loss of consortium.  Specifically, in claiming negligence, Plaintiffs alleged that Jonita "slipped and fell on black ice which had formed in certain defects and depressions in the concrete walkway."  According to the complaint, the "black ice formed due to defects and depressions in the concrete, the unnatural accumulation of ice in the defects and depressions, and the negligent removal and piling of snow along the sides of the defects and depressions where the

snow melted, flowed into the defects and depressions and then froze in a thaw freeze cycle."

{¶ 5} On December 19, 2023, Plaintiffs voluntarily dismissed without prejudice all causes of action against Clarkwood. On January 29, 2024, Plaintiffs filed a new complaint against Clarkwood alleging negligence and loss of consortium. On May 21, 2024, the trial court consolidated the two cases. On August 22, 2024, the court granted both Clarkwood's and H&M's motions for summary judgment. Plaintiffs appeal raising two assignments of error for our review.

> I. The trial court erred by granting Clarkwood's Motion for Summary Judgment.

> II. The trial court erred by granting H&M Snow Pros' Motion for Summary Judgment.

{¶ 6} We note that Plaintiffs' first assignment of error has been rendered moot because Plaintiffs dismissed their case against Clarkwood on May 29, 2025. We proceed with Plaintiffs' second assignment of error, which concerns the remaining appellee in this case, H&M.

## II. Summary Judgment Evidence

### a. Deposition Testimony

{¶ 7} In their brief in opposition to H&M's summary judgment motion, Plaintiffs attached the deposition transcripts of Jonita; Ernest; Laurie Figueroa ("Figueroa"), the property manager for Clarkwood; Monique Workman-Stafford ("Workman-Stafford"), a neighbor of Plaintiffs at Clarkwood; and Mark Mazzurco ("Mazzurco"), the owner of H&M. We note again that the following deposition

testimony pertains only to H&M's liability in this case, and we have omitted from this opinion testimony pertaining to Clarkwood's liability since Clarkwood is no longer a party to this appeal.

### i. Jonita Price

{¶ 8} Jonita testified that she and Ernest have lived at the Condo for 33 years. According to Jonita, there is a "set of steps" that lead to the front entrance of the Condo. At approximately 7:00 a.m. on December 3, 2020, Jonita and Ernest exited the front of the Condo to go to work. Jonita testified that it was dark outside. "As I was exiting, walking down the stairs, I looked, stepped onto the walkway and as I stepped onto the walkway, I fell," Jonita stated. Jonita testified about two photographs Ernest took of the Condo's front walkway although she said that she did not know when Ernest took the photographs. Jonita agreed that she "had safely negotiated the stairs" before she fell on the walkway.

{¶ 9} According to Jonita, the "snow plow company . . . typically will shovel or remove snow" from the step and walkway area. She testified that she did not know when the area was last shoveled or the snow was last removed. Asked what the weather was like that morning, Jonita said, "Snow and cold, freezing." Jonita did not recall if it was still snowing at the time but that she was "aware that there was snow on the ground before" she exited the Condo because she "looked as [she] was walking down the stairs." According to Jonita, there "was snow on both sides of [the walkway] and on the ground" and she could not see the concrete because it

was "covered with a blanket of snow." Jonita additionally testified that she was wearing "[s]now boots" that morning.

{¶ 10} Asked if she "[h]ad ever had any difficulty walking up and down those steps or through that walkway at any point in time before this incident," Jonita answered, "No." According to Jonita, the front steps to the Condo "were clear" of snow and she walked down them with "no problem." Jonita testified that she could see "snow on the sidewalk area" at the bottom of the stairs and that is where she "slipped." Specifically, Jonita testified that she fell "[a]s soon as [she] stepped off of the last step." Asked what caused her to slip, Jonita answered, "[B]lack ice." Jonita stated, "I did not see [the black ice;] it was not visible to my eye."

{¶ 11} Asked "if anything was different about this day than the numerous other times when it snowed in Northeast Ohio that you walked through that area without incident," Jonita answered, "The only thing I can tell you is . . . that I fell." According to Jonita, she fell on her "butt" and broke her right ankle. Jonita testified that, during the 30 years she had lived at the Condo, she "did not complain" to anyone about the "condition of the sidewalk or relative to snow removal of that area . . . ." Asked what, in her opinion, "should have [been] done that they didn't do that contributed to you slipping," Jonita responded, "Well, I feel if it was salted properly." Jonita added that she did "not know if it had been salted at all."

{¶ 12} Jonita testified that, at times, Ernest "would try" to salt the area "[o]n the steps" and shovel the area "[t]o make sure that the steps [were] safe." Asked why Ernest "didn't salt the area or shovel the area where [she] fell that morning," Jonita

answered, "No, because normally . . . he would put salt on the platform or on the steps . . . ." Jonita testified that the snow removal company "typically . . . put the piles of snow immediately abutting the sidewalk area" as depicted in the photographs used in her deposition, although she "never really saw them [do the] work."

{¶ 13} Asked if she could "offer any other explanation as to how or why this happened except that you simply slipped on the ice and snow that had accumulated in that area," Jonita responded, "That's what happened." Jonita agreed that she "saw snow in that area," she "knew that" she "needed to be careful" and she "tried to be careful."

{¶ 14} Jonita testified that, typically, the snow that would pile up on either side of the walkway would melt, the water would flow over the walkway and, if the temperature dropped below freezing, this water would turn to ice. According to Jonita, the day she fell "was not the first time it happened where it snowed and it melted and" there would be water on the walkway "because of the way that the cracks and everything" were. Asked if she was aware that a freeze-thaw cycle "would cause puddling" prior to her fall, Jonita answered, "Yes . . . . I was aware of that, that's when I walk down the stairs, I was careful, I watched." Jonita further agreed that, during the 30 years that she lived at the Condo, at times this "puddling" would "refreeze" and become "black ice." Jonita clarified that "as I was walking down [there] was snow on the walkway that was covering the black ice."

### ii. Ernest Price

{¶ 15} Ernest testified that he and Jonita have lived in the Condo since 1985. On December 3, 2020, he and Jonita left for work "[a]bout 7:00 a.m." According to Ernest, it was still dark, it was cold and there "was snow outside, for sure." Ernest testified that he had "winter shoes" on and Jonita had "[s]now shoes" on. According to Ernest, "[t]here is a light on the porch area . . . but it's not well lit." Ernest testified, as follows, about the incident at issue in this case: "We both walked out the door together. I'm walking ahead of her. Just three steps so I'm down, and all of a sudden I hear a yell that she fell . . . ." Ernest further testified that he did not have any difficulty walking in this area.

{¶ 16} Asked if "the snow [had] been cleared, at all, the morning of [Jonita's] fall," Ernest answered, "Don't recall." Ernest further testified that he took various photographs of the area in which Jonita fell, but he did not take any on the day of the incident that reflected the snow and ice conditions at the time of the fall.

{¶ 17} On December 4, 2020, the day after Jonita's fall, Ernest sent the following email to Figueroa: "My wife slipped on some black ice yesterday in front of my unit on the way to work and broke her right ankle in two places. Part of the problem is the grade in front of our unit is too low and collects water that freezes. Until this is corrected we are exploring using the rear door but would need a handrail. (My expense.)." Figueroa replied, "Sorry to hear that, I will send to the board for further direction." Ernest included the photographs of the walkway in front of the Condo with this email and "guessed" that he took them but could not

confirm this. Additionally, he was "not sure" when these photographs were taken although he did not take any photographs on the day Jonita fell.

{¶ 18} Ernest testified about one of these photos, which showed "some snow piled up to the side of the walkway area." According to Ernest, this was "typical" and he "thought" H&M piled the snow there. Ernest testified that he had seen H&M remove snow from the walkways using shovels. Ernest testified that he never "objected to" or had any "concerns" about H&M piling snow "to the side of the walkway."

{¶ 19} Ernest testified that there was not "typically a time" when H&M would shovel or otherwise remove snow at the Condo. According to Ernest, he never made a "formal complaint" to anyone about H&M's services. Asked if he felt H&M was "doing a reasonable job," Ernest replied, "Snow removal companies, such as this company, came when they wanted to based on whatever schedule of customers they had. We, as unit owners, really have no idea when they're going to come so, to press them doesn't make sense. It's an exercise in futility." Ernest testified that he did not recall if he salted or shoveled the area before he and Jonita left on the morning that Jonita fell.

{¶ 20} Asked who he "blamed" for Jonita's fall, Ernest answered as follows: "All I would say is, again, as I stated before, had that sidewalk been repaired, and I can't guarantee it because I am not the expert in that area, but had that sidewalk been repaired and been level versus broken off, I don't believe that the black ice

would have accumulated and thus, my wife slipping and falling and breaking her right ankle."

### iii. Laurie Figueroa

{¶ 21} Figueroa testified that she is employed by Clarkwood as the property manager and held this position in 2020 when Jonita fell. According to Figueroa, her duties as property manager are to "do walk-throughs, . . . take maintenance calls, help with contracting various contractors for maintenance [and] landscaping." Figueroa would "seek out the contractors and obtain estimates," then she would present these to Clarkwood's board for approval. Additionally, Figueroa would attend board meetings and she kept the minutes from these meetings.

{¶ 22} Figueroa testified that in 2018, 2019 and 2020, no residents complained about "broken pavement on the walkway leading to their" condominiums, but she did receive complaints about snow removal on these walkways. According to Figueroa, she received complaints about black ice on the sidewalks, but she did not receive any complaints about black ice on the walkways leading to the units. Figueroa did not recall if the "broken pavement" complaints were discussed at any of the board meetings and testified that the "black ice" complaints were not discussed at any board meetings.

{¶ 23} Figueroa testified that she became aware of Jonita's fall that is the subject of this case when Ernest "sent an email" about it. Asked her understanding of how Jonita fell, Figueroa answered, "She was coming down her steps and she

slipped and fell on black ice." Figueroa testified that her understanding of black ice was "[t]hat you can't see it, but it's there. It's slushy and slippery."

{¶ 24} Figueroa testified about an email she received on November 1, 2018, from Willinda Richardson ("Richardson"), a Clarkwood resident, with a subject line stating, "Danger of standing water between 4754 and 4752 Walford." The email reads, in part, as follows: "Attention Laurie, this is the scene at the location any time we get rain and melting snow.[1] When it freezes it is hazardous. I had a very bad fall because of it a few years ago. Even when it's not frozen, it makes back entrances impossible."

{¶ 25} Figueroa testified about another email that Richardson, who was Clarkwood's board president at the time, sent to her on January 19, 2020. In this email, Richardson wrote that the snow removal "seems subpar for what we contracted for." Figueroa testified that she and Richardson had conversations about Richardson's concern regarding the snow removal in January 2020 but there was no discussion about black ice at the time.

{¶ 26} Figueroa agreed that Richardson's emails pertained to the walkways at the rear of the building. Furthermore, Figueroa stated that the issue was inspected and fixed. Asked if she was aware of "other issues of freezing of water that would freeze on walkways and cause someone to slip and fall," Figueroa answered, "No."

---

[1] Although Richardson's November 1, 2018 email states "this is the scene," there is nothing attached to this exhibit, such as photographs or other visuals, depicting the "scene."

{¶ 27} Figueroa further testified that a resident named Deborah Cloud ("Cloud") "had a situation where she fell as well" on black ice in January 2019. The following is from an email Cloud sent to Figueroa. "Just weeks ago I wrote [Clarkwood] about the possibility of someone falling on the ice on our property. I mentioned the unpredictability of climate change making it harder to adjust to the winter snow removal needs of [Clarkwood]. While snow accumulation has been slight so far this season, today was the second time, that I can recall, for black ice to be a major factor." Asked if she "perceive[d] black ice to be a major factor at Clarkwood," Figueroa answered, "No."

{¶ 28} Figueroa testified that, after Cloud's fall and email, Clarkwood's board "recommended to salt there as needed." According to Figueroa, salting of the premises was part of Clarkwood's contract with H&M as "an on call basis" or as requested. Figueroa testified that she or the board would "put in those requests." Figueroa testified that her understanding of the as-needed "deicing services" included "sidewalks" and the parking lot.

{¶ 29} Figueroa testified that she did not recall "having a call for" the walkways leading up to the front doors at Clarkwood to be salted. She further testified that the "Clarkwood board used to do salt bags for the owners and they would have the responsibility of putting the salt out." Figueroa testified that, as of 2017, this is no longer the board's policy.

{¶ 30} According to Figueroa, it was H&M's responsibility "to shovel the walkways that lead up to" the Clarkwood condominiums' doors. According to the

contract between Clarkwood and H&M, H&M would come out up to twice a day, if certain criteria was met, to do this. Figueroa testified that she discussed snow removal with Mike Barnes ("Barnes") from H&M after Richardson's email. H&M responded "[t]hat they would take care of it, or they missed it, or would be coming back."

{¶ 31} Figueroa testified that she sent an email to Barnes on December 2, 2020 with a subject of "Snow removal." The email stated, "Here are some photos that I just got from building 4744. Back sidewalks were not touched [sic] units 1 and 2 have no walkways to the garage." It is unclear whether the photographs referred to in this email are part of the record in this case.

{¶ 32} Figueroa further testified that, after Jonita's fall, Clarkwood had the "cracks" in the pavement in front of the Condo "fixed." Figueroa testified that what "triggered the repair" was the "pooling water." Figueroa testified that she did not "believe" that she "put it in as a maintenance request" so there would be no "notes" about this.

### iv. Monique Workman-Stafford

{¶ 33} Workman-Stafford testified that she moved into Clarkwood in 2003 and has known the Plaintiffs since then. At the time of her deposition, Workman-Stafford was the president of Clarkwood and for the prior five years, she was the treasurer. Workman-Stafford did not recall if Jonita's fall was discussed at any of the board meetings.

{¶ 34} Workman-Stafford testified that she works out in the early morning at home and, on December 3, 2020, she looked out her window and saw Jonita "on the ground." Workman-Stafford did not see Jonita fall. According to Workman-Stafford, it was "customary" for snow "to be piled up either left or right of the steps leading up to . . . all the units. That's how they shovel the snow." She further testified that "[j]ust about" all the units had "cracks through the concrete pavement immediately below the steps." She further testified that "[j]ust about all units" experience ice "collected on the concrete near the steps" when there is a "thaw freeze cycle." Asked if anyone has ever complained that this "creates black ice and it's hazardous," Workman-Stafford stated, "If it does happen, each unit is given a bag of [salt] to put the [salt] down."

{¶ 35} Workman-Stafford testified that there "was a lot of snow" on the ground on the day in question and one could "[p]robably not" see the ice under the snow at 7:00 a.m. when it was still dark outside. According to Workman-Stafford, after Jonita fell, she "got up and walked back into the house." Workman-Stafford sent her son to help Jonita when she came back out of the Condo because, by that time, Jonita could not walk on her own.

{¶ 36} Workman-Stafford testified that H&M "had the contract to do the snow removal" and they typically shoveled the walkways. Asked if she felt H&M "did a good job of it," Workman-Stafford replied, "When they do it, yes." Asked if H&M "would also spread salt or some type of chemical to melt ice," Workman-Stafford answered, "They have done it, but like I said, each unit is required to put their own

salt down.  When this happened we just recently added salt to the contract."  Asked why salt was added, Workman-Stafford said, "It was just in their bid."

{¶ 37} Workman-Stafford testified about the Sunday, January 19, 2020 email from Richardson to Figueroa.  Asked if, based on this email, she thought H&M was doing "a good job, an average job, or a subpar job," Workman-Stafford replied as follows:  "They were doing their job, but I don't know if I need to shovel it . . . .  I mean, if it was a Sunday, I don't know if they come on Sundays.  I don't know."

{¶ 38} Asked if it was a "common occurrence" at Clarkwood that there was "a collection of water at the base of those steps," Workman-Stafford answered, "I never seen a collection of water at the base of the steps.  The water would be on the sidewalk from the steps, so I never seen water there like that.  This was the day after the snowfall, because usually it would be the snowfall, and then, it would clear up."

### v.  Mark Mazzurco

{¶ 39} Mazzurco testified that he is the owner of H&M and he started the company "35 plus years ago."  According to Mazzurco, he has 200 employees in the winter.  Mazzurco testified that he has been a member of the Snow and Ice Management Association for 20 years and he has taken various "continued education" classes in the field.  According to Mazzurco, Barnes used to "run that area" (meaning Clarkwood), but Barnes is no longer with H&M.  Mazzurco testified about the differences between melting ice with sodium chloride, which is salt, and calcium chloride, which works in colder temperatures than salt does.  According to

Mazzurco, he used "a premium product . . . kind of a blend of the two" for the "sidewalk services" at Clarkwood.

{¶ 40} Mazzurco testified about the "mechanisms" H&M uses to track its crews "in the field during a snow or ice event." "Route sheets" apply to each worker, "master sheets" apply to each supervisor and "rounds" refer to multiple routes run in the same day "because people aren't good at putting a.m. or p.m. on sheets." According to Mazzurco, supervisors "drive their route afterwards and inspect each property."

{¶ 41} Mazzurco testified that H&M did not retain "documentation regarding the amount of deicing product or traction product used at Clarkwood Condominiums in December of 2020." According to Mazzurco, he looked for this information, but it "was already purged." Normally, this information would include the product used and whether an area was shoveled or plowed. The decision of what product to use at a location was "[i]n the contract because it comes in a price structure, good, better, and best." According to Mazzurco, the walkways at Clarkwood are "pretty tight," being only three feet wide, and the product used to melt ice has to be spread by hand from a five-gallon bucket.

{¶ 42} Mazzurco testified that H&M has been servicing Clarkwood for "seven or eight years." H&M does a preseason and postseason inspection of the property to "look at any damages that happen, including anything to pavement, parking bumpers, anything salt damage to sidewalks or grass turf areas." Mazzurco testified that H&M documents "things we have to go back and fix or things that [Clarkwood]

thought that we did." According to Mazzurco, his supervisors have been trained to either document or "say something" to a property owner if they see "an area where water would accumulate and be subject to the thaw-freeze process . . . ." Mazzurco further stated that "if we saw something that was enough of a safety hazard, we would say something like, 'Hey, would you like some drainage put in or the concrete replaced?' Because we offer that service." H&M did not document, report to Clarkwood or do any repair work to the walkway on which Jonita fell. According to Mazzurco, "the freeze-thaw process affects this entire facility . . . . That's why I don't know how you report that because it happens on this entire property."

{¶ 43} Asked about the process of "snow shoveling for the walkway," Mazzurco answered, "Typical removal process is snow gets left or right of the walkway . . . . Most of the time when you take snow, you take it off the concrete surface and put it next to it." Mazzurco was shown the photographs of the front entrance of the Condo where Jonita fell, and he was asked if he "would do something different" because of the "depressed area" in the concrete walkway. Mazzurco answered, "I don't see a depressed area, like this being a hole or something, not enough that it would stand out. I don't think there was anything wrong with the way it looks like it was being shoveled."

{¶ 44} Mazzurco agreed that black ice is "very difficult to see . . . . It would look wet, but you wouldn't know if it was ice or water. But it would definitely look wet." Mazzurco further testified that "it is winter in Cleveland, so I try to be cautious any time I see anything that is wet."

**{¶ 45}** Mazzurco testified that H&M tried "to focus on main entries" when it serviced "condominium accounts" and agreed that "primary walkways are critical areas for snow and ice removal." Mazzurco further agreed that the area in which Jonita fell is considered a "main entrance" or a "primary walkway." According to Mazzurco, the contract between H&M and Clarkwood specified that "[s]idewalks are to be shoveled when snow reaches specific triggered depth." According to this contract, the triggered depth was two inches. This contract also states that "main entries" and "primary walkways . . . will be attended to first." Asked if the contract required H&M to salt, or otherwise "deice" the walkways, in addition to shoveling them, Mazzurco answered as follows:

> [U]sually there would be another line item in here if we were salting or putting product on [the walkways]. . . . But this doesn't have the paragraph here for salting on that walkway . . . . The way this reads to me — so the way that our contracts are usually set up, it's usually set up by shoveling, shoveling or deicing, and then the plowing service, and then salting of the parking lots. The way this reads to me is that we are only supposed to salt the parking lot. Because it says, "After plowing occurrences." Usually there's another section that says, "Salting the walkways."

**{¶ 46}** Mazzurco testified that it was "pretty typical" to shovel the walkways at "a lot of our condominium complexes" rather than "provide deicing" to the walkways. Mazzurco further testified that "sometimes, as an aside, the condo complex will have us salt on a per-occurrence basis, like, they will give us a call. That would be outside of the contract."

### b. Expert Reports and Affidavits

{¶ 47} In opposing summary judgment in the trial court, Plaintiffs filed affidavits of two expert witnesses. The first expert affidavit is from Richard Zimmerman ("Zimmerman"), a registered architect, and the second is from John Allin ("Allin"), "an expert at snow and/or ice management."

### i. Richard Zimmerman

{¶ 48} Zimmerman stated in his affidavit that he visited Clarkwood on December 21, 2023, and reviewed documents associated with this case including parts of the Ohio Revised Code and the Ohio Building Code. Zimmerman's expert opinion applies only to Clarkwood, who is no longer a party to this appeal.

### ii. John Allin

{¶ 49} Allin stated in his affidavit that he reviewed documents related to this case, including deposition "overviews" and photographs. Allin did not visit Clarkwood. Allin concluded that H&M "failed to properly follow generally accepted practices with regards to the proper utilization of snow and/or ice mitigation techniques . . ."; H&M "failed to meet . . . the applicable standard of care" for snow and ice management; and H&M "allowed a foreseeable hazardous condition on the broken, cracked, and depressed subject walkway area to be present . . . ."

{¶ 50} Allin additionally opined in his expert report, which was attached to his affidavit, that

> ice was on the sidewalk area on December 3, 2020. This icy condition made it unsafe for [Jonita] to use the sidewalk area to walk upon. [H&M] did not properly and/or adequately address the dangerous condition in the area where [Jonita] slipped and fell. It is within a

reasonable degree of professional certainty that the ice accumulated as a result of meltwater running from snow piled alongside the walk to a low spot in the sidewalk. The snow was from the prior snowfall, and the meltwater was from fluctuating temperatures and fair conditions prior to [Jonita's] incident. The site conditions existed from improper snow clearing and/or no deicing or traction material having been applied or applied properly to mitigate the ice buildup on the sidewalk area prior to and/or on the day of the incident. Not being aware of and/or addressing the conditions resulted in the area being dangerous for pedestrian traffic. [H&M] did not properly mitigate the dangerous icy condition on this area on December 3, 2020.

{¶ 51} Furthermore, Allin's expert affidavit and report refer to various "best practices" from multiple industry entities and appear to conclude that these "best practices" serve to heighten the standard of care for snow and ice management. For example, Allin stated that H&M "failed to take advantage of readily available and free best practice standards through a recognized snow industry association so as to abide by industry customs and practices to ensure a safe environment for those who use" Clarkwood.

### III. Law and Analysis

#### a. Summary Judgment Standard of Review

{¶ 52} We review summary judgment rulings de novo, applying the same standard as the trial court. *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105 (1996). We give no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate. Pursuant to Civ.R. 56(C), the party seeking summary judgment must prove that (1) there is no genuine issue of material fact; (2) they are entitled to judgment as a matter of law; and (3) viewing the evidence in favor of the nonmoving party, reasonable minds can

come to but one conclusion and that conclusion is adverse to the nonmoving party. *See also Dresher v. Burt*, 75 Ohio St.3d 280 (1996).

### b. Common Law Negligence and Snow and Ice Accumulation

{¶ 53} To succeed on a claim for negligence, a plaintiff must prove "(1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; and (3) the breach of duty proximately caused the plaintiff's injury." *Bailey v. River Properties*, 2006-Ohio-3846, ¶ 9 (8th Dist.), citing *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.,* 81 Ohio St.3d 677, 680 (1998). "The existence of a duty in a negligence action is a question of law for the court to determine." *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989).

### i. H&M's Duty of Care to Plaintiffs

{¶ 54} In determining whether H&M owed Plaintiffs a duty of care in this case, we are mindful that "premises liability" law does not apply to these facts because H&M does not own the property on which Jonita fell. *See Yoak v. Univ. Hosps. Health Sys., Inc.,* 2022-Ohio-3550, ¶ 26 (8th Dist.) ("In other words, UH was not a 'landowner' who owed a duty to an 'entrant' in the case at hand. Therefore, we find that UH did not owe a duty to Yoak under premises liability law . . . ."). Rather, this case involves a common-law negligence claim.

{¶ 55} Ohio courts have held that a "defendant's duty to a plaintiff depends upon the relationship between the parties and the foreseeability of injury." *Thayer v. B.L. Bldg. & Remodeling, L.L.C.,* 2018-Ohio-1197, ¶ 24 (8th Dist.). "The test for foreseeability is whether a reasonably prudent person would have anticipated that

an injury was likely to result from the performance or nonperformance of an act." *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77 (1984).

{¶ 56} In this case, the relationship between Plaintiffs and H&M is based on H&M providing snow and ice removal services to Clarkwood, in which Plaintiffs reside. Furthermore, injury is foreseeable when walking on snow and ice. *Hoenigman v. McDonald's Corp.*, 1990 Ohio App. LEXIS 131 (8th Dist. Jan. 11, 1990) ("The accumulation of ice and snow is a condition created by the elements, a natural hazard faced by anyone who would venture about the streets while such conditions exist.").

{¶ 57} In *Yoak*, this court expanded upon the concept of "duty" in a common-law negligence claim:

> "[A]ctors engaging in conduct that creates a risk to others have a duty to exercise reasonable care to avoid causing physical harm." Restatement of the Law 3d, Torts, Section 7 (2010). "The minimum standard of care expected under any circumstance is to exercise that degree of care and caution that an ordinary careful and prudent person would exercise under similar circumstances." *Cromer v. Children's Hosp. Med. Ctr. of Akron,* 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 27.

*Yoak*, 2022-Ohio-3550, at ¶ 14.

{¶ 58} Accordingly, we find that H&M owed a duty to Plaintiffs to act with reasonable care under common law principles of negligence.

{¶ 59} In addition to common law negligence principles, H&M also owed a duty to Plaintiffs pursuant to their contract with Clarkwood. *See, e.g., Jones v. Action Now Pest Control*, 2010-Ohio-1543, ¶ 15 (7th Dist.); *Krause v. G & C*

*Properties*, 1994 Ohio App. LEXIS 4941, * 5-6 (8th Dist. Nov. 3, 1994); *Hubbell v. Xenia*, 2008-Ohio-490, ¶ 25 (2d Dist.) ("While a breach of contract is ordinarily not a tort, a common-law duty to perform with care, skill, reasonable expedience, and faithfulness is incidental to every contract, and the negligent failure to observe those conditions may constitute a tort.").

{¶ 60} Specifically, by agreeing to perform certain services pursuant to a contract, H&M "has assumed the affirmative duty to exercise ordinary care to avoid injury to others as result of its execution of its contractual duties." *Jones* at ¶ 15. Indeed, even in the absence of contractual privity, "a party to a contract may be liable to a third party if he performs his contractual duties in a negligent manner which would foreseeably cause the third party's injuries." *Id.*, citing *Durham v. The Warner Elevator Mfg. Co.*, 166 Ohio St. 31 (1956). This duty, however, "is limited, as a matter of law, by the agreement between the contracting parties" or, stated otherwise, "'limited to the duties assumed under the contract.'" *Id.* at ¶ 16, quoting *Church v. Fleishour Homes, Inc.,* 172 Ohio App.3d 205, ¶ 69 (5th Dist. 2007). Further, "a service provider does not have a duty to third parties outside the scope of their contract, even if such action could have prevented injury." *Id.*; *see also Perez v. Crown Equip. Corp.*, 2022-Ohio-4761, ¶ 14-15 (3rd Dist.).

{¶ 61} The interplay between a tort standard, contractual terms, and a third party was acknowledged by this court in *Meros v. Sunbelt Rentals, Inc.*, 2023-Ohio-4313, ¶ 16 (8th Dist.), quoting *Krause v. G&C Properties*, 1994 Ohio App. LEXIS 4941 (8th Dist. Nov. 3, 1994):

Further complicating appellants' broad generalization of the duty element, as is applicable in this case, [the independent contractor] was hired by Sunbelt to perform an on-demand task. If there is a duty owed by the independent contractor to third parties, that duty arises under the terms of the contract: "The scope of the contractor's duties to third parties, if any, is generally limited to the duties assumed under the contract." . . . .

*See also Krause* at 4941 ("If an independent contractor contracts to maintain equipment and report on the condition thereof, and the equipment is of such a nature as to make it reasonably certain that life and limb will be endangered if such work is negligently performed, the contractor has a duty to third parties to perform its contractual duties with ordinary care.").

{¶ 62} Accordingly, we find that H&M owed a duty of reasonable care to Plaintiffs under both the common law principles of negligence and pursuant to their contract with Clarkwood.[2]

### ii. The Scope of H&M's Duty to Exercise Reasonable Care

{¶ 63} Next, we turn to the question of what is "reasonable care" concerning snow and ice removal. This court addressed the issue in *Dunbar v. Denny's Restaurant*, 2006-Ohio-1248 (8th Dist.):

To establish liability based on negligent plowing . . . an appellant must prove that negligent plowing created or aggravated a hazardous condition . . . . Persons who plow or shovel snow are not negligent merely because ice remains after snow is cleared. . . . "'After snow is removed from the surface of the parking lot, it must be disposed of.

---

[2] Plaintiffs argue that they "were intended third-party beneficiaries" of the contract between H&M and Clarkwood. However, Plaintiffs did not bring a breach-of-contract claim in this case, and the third-party beneficiary doctrine does not apply. *See Boatwright v. Penn-Ohio Logistics*, 2012-Ohio-6238, ¶ 53 (7th Dist.) ("Only the parties to a contract or third-party beneficiaries to the contract can maintain an action for damages that is based upon the breach of a contract.").

> Snow must be placed somewhere.' Accordingly, *** in order to show that ice and/or snow was cleared negligently, a plaintiff must present evidence that 'the risk of injury was substantially increased' from the risk normally associated with those conditions that create accumulations of ice and snow in the winter in Ohio." *Zamano v. Hammerschmidt, Inc.,* Huron App. No. H-02-031, 2003-Ohio-1618 (citing *Hoenigman v. McDonald's Corp.* (Jan. 11, 1990), Cuyahoga App. No. 56010, 1990 Ohio App. LEXIS 131).
>
> When snow and ice are piled up by plowing or shoveling and then thaw and refreeze, the resulting ice is a natural accumulation. *Lopatkovich v. Tiffin* (1986), 28 Ohio St.3d 204, 208, 503 N.E.2d 154.

*Dunbar* at ¶ 13-14. *See also Lopatkovich v. Tiffin*, 28 Ohio St.3d 204, 206 (1986) (acknowledging "the simple fact that snow and ice are part of wintertime life in Ohio"); *Norwalk v. Tuttle*, 73 Ohio St. 242, 245 (1906) ("In a climate where the winter brings frequently recurring storms of snow and rain and sudden and extreme changes in temperature, these dangerous conditions appear with a frequency and suddenness which defy prevention and, usually, correction.").

{¶ 64} Although this is no longer a premises liability case, it is long-standing Ohio law that, generally, there is no duty to remove "natural" accumulations of snow and ice. However, liability may arise when a defendant negligently causes an "unnatural" accumulation of snow and ice. In *Mubarak v. Giant Eagle, Inc.,* 2004-Ohio-6011, ¶ 18, 19 (8th Dist.), this court set forth in detail the law regarding the distinction between "natural" and "unnatural" snow and ice accumulation:

> [A]n owner or occupier owes no duty, even to a business invitee, to remove natural accumulations of ice or snow . . . . However, there are exceptions to the general rule . . . . Northeastern Ohio's freeze and thaw cycles, which commonly cause ice formations, are natural accumulations absent a showing of negligence on the part of the landowner or occupier . . . .

[One] exception to the no-duty rule exists where the owner is actively negligent in permitting or creating an unnatural accumulation of ice and snow . . . . An "unnatural accumulation" refers to causes and factors other than winter weather's low temperatures, strong winds, drifting snow, and natural thaw and freeze cycles. By definition, an unnatural condition is man-made or man-caused. Unnatural accumulations are caused by a person doing something that would cause ice and snow to accumulate in an unexpected place or way . . . .

{¶ 65} In other words, to overcome summary judgment in this case, Plaintiffs must demonstrate that H&M was "actively negligent in permitting or creating an unnatural accumulation of ice and snow." However, "Ohio courts have repeatedly held that an accumulation of ice is not unnatural simply because water collected in a depression in a sidewalk or driveway and subsequently froze due to cold weather." *Lawrence v. Jiffy Print, Inc.,* 2005-Ohio-4043, ¶ 31 (11th Dist.). *See also D'Ambrosi v. Vicorp Specialty Restaurant, Inc.,* 1989 Ohio App. LEXIS 628 (8th Dist. Feb. 23, 1989) (affirming the trial court's granting summary judgment to the defendants when "the only evidence presented by the plaintiffs as to the cause of the ice accumulation is [the plaintiff's] deposition testimony and sworn statement that the ice formed in a surface depression in the defendant['s] parking lot").

{¶ 66} To the extent that Jonita's fall was caused by ice that accumulated in the depression of the walkway to the Condo, we find that, as a matter of law, H&M cannot be held liable for this because it is a "natural" accumulation and there is no duty to remove a "natural" accumulation of ice and snow in Ohio. Both Zimmerman and Allin, in their expert affidavits, refer to the accumulation of ice in this area as "unnatural." Zimmerman calls this unnatural solely because of the depressed area

in the walkway and the pooling of water that then froze. Zimmerman offers no opinion regarding H&M's snow and ice removal services. Allin, on the other hand, attributes the ice accumulation to two things. First, he agrees with Zimmerman that the ice accumulated due to water pooling in the depressed area and subsequently freezing. We disregard the Plaintiffs' expert opinions that the accumulated ice in this case was "unnatural" solely because it pooled in a lower area of the walkway. As shown, Ohio courts have held otherwise. *See Lawrence*; *D'Ambrosi.*

{¶ 67} In *Graham v. Szuch*, 2014-Ohio-1727, ¶ 36 (8th Dist.), this court stated that an expert "affidavit must set forth facts, not legal conclusions . . . ." *See also* Civ.R. 56(C); Evid. R. 701; *Feorene v. Robert C. Barney, DVM, Inc.,* 2012-Ohio-3461, ¶ 18 (8th Dist.) ("Conclusory allegations alone are insufficient to overcome a motion for summary judgment that is property supported."); and *Lang v. Beachwood Pointe Care Ctr.,* 2017-Ohio-1550, ¶ 42 (Expert witnesses may not "interpret" that law because that is within the sole province of the court.).

{¶ 68} Accordingly, Zimmerman's and Allin's conclusions that the ice in front of the Condo accumulated "unnaturally" does not hold water (pun intended) against Ohio law stating that this is a natural accumulation of ice. Therefore, we disregard the experts' legal conclusions on this specific point.

{¶ 69} Allin's second reason that the ice accumulation in this case was "unnatural" is that H&M failed to meet the standard of care regarding snow and ice management. However, Allin appears to state in his expert report that the standard for snow and ice remediation is higher than a duty to exercise reasonable care. Much

of Allin's report concerns the actions or inactions of Clarkwood as the property owner. As noted earlier, Clarkwood is no longer a party to this appeal, and we disregard Allin's conclusions and opinions as related to Clarkwood.

{¶ 70} As related to H&M, Allin cited to numerous "best practices" ostensibly to establish that the standard of care for snow and ice mitigation was heightened and amounted to more than ordinary or reasonable care. For example, Allin referenced "The Snow & Ice Management Association (SIMA) . . . *Best Practices Checklist*" as follows:

EXECUTION & COMMUNICATION:

- Pre-event communication to customers regarding upcoming event and planned response

- Documented snow response planning process for various storm scenarios

- Documented snow site engineering plan verifies priority areas and zones (e.g., handicap zones, fire exits and hydrants, drains, etc.) and areas for snow relocation

- Define a weather monitoring process, which may include third-party outsourcing

- In-season site/route inspections monitor operational processes

SERVICE VERIFICATION:

- Implement a documented verification process (e.g., site visit/work completion logs)

- Conduct post-service inspections to verify and document service completion

- Provide post-event communications to clients related to weather and services rendered

SAFETY & RISK MANAGEMENT:

- Use a documented site engineering plan to verify where to properly locate snow to prevent thaw and refreeze hazards and line-of-sight issues

- Documented safety program and policies, including incident reporting process, ongoing education, training and implementation

{¶ 71} Allin concluded that "the above practices were obviously not in place and/or in effect on this site at the time of [Jonita's] slip-and-fall incident, nor did the defendants take actions consistent with the above required practices."

{¶ 72} Allin further asserted in his affidavit and expert report that H&M did not provide a "written snow response plan" or a "written post-event plan"; H&M failed to provide "documentation . . . showing what actions were taken at the site"; H&M failed to "participate[] in any of the numerous educational opportunities available online and throughout the United States"; H&M failed to engage "a professional weather prediction service"; H&M failed "to perform a preseason site inspection" and a "post-event inspection" and H&M "apparently failed to train its management and/or employees in proper snow and ice management procedures or proper deicing material application."

{¶ 73} The idea that "best practices" in the snow and ice removal industry legally elevated the standard of care in this case is wholly unsupported by Ohio law. *See, e.g., McCarthy v. Abraham,* 2023-Ohio-4845, ¶ 10 (10th Dist.) (noting that "the difference between the standard of care and a best practice is 'the standard of care

is the minimum' and 'best practices is something over the standard of care'"); *Liggins v. Giant Eagle McCutcheon & Stelzer*, 2019-Ohio-1250, ¶ 23 (10th Dist.) ("[T]he premise that voluntarily adopted, internal safety guidelines or policies should impose legal duties on companies that adopt them is contrary to public policy." Defendants "should be encouraged to establish safety policies that represent 'best practices' or exceed the duties imposed by the common law standard of care without facing liability for the alleged violations of those policies."); *Ianetta v. Joyce Passov Commercial Property Mgmt., L.L.C.,* 2021-Ohio-4520, ¶ 25 (8th Dist.) ("Appellant's reliance on the best practices and safety standards for speed bump installation and [their] expert report are misplaced.").

{¶ 74} Accordingly, we conclude that the general duty to exercise reasonable and ordinary care applies to this case. *See Hoenigman,* 1990 Ohio App. LEXIS 131 ("If snow and ice is removed, one must use ordinary care in its removal.").

### iii. Contractual Duty of Care

{¶ 75} Pursuant to the above reference law, we add to our scope-of-duty analysis the pertinent parts of H&M and Clarkwood's contract concerning snow and ice removal for the individual condominiums' entrance and walkway areas, which is where Jonita fell.

{¶ 76} In this contract, there are three sections under "Season Contract Pricing" describing plowing, shoveling and salting: 1) FULL PLOW INCLUDES ENTIRE PROPERTY; 2) SHOVELING WALKS; AND 3) FULL SALT ENTIRE PROPERTY INCLUDING PLOW AND NON-PLOW EVENTS.

{¶ 77} The "FULL PLOW INCLUDES ENTIRE PROPERTY" area is described in the contract as follows: "Critical areas such as drives, hills, lanes, intersections, and means of egress will be attended to first, followed by non-priority areas such as docks and vacant parking."

{¶ 78} The "SHOVELING WALKS" area is described in the contract as follows: "Critical areas such as main entries, primary walkways, emergency exits, stairs and means of egress will be attended to first, followed by non-priority areas."

{¶ 79} "FULL SALT ENTIRE PROPERTY INCLUDING PLOW AND NON-PLOW EVENTS" area is described in the contract as follows: "Application(s) of salt (or other deicer chemicals as specified in the contract) for snow and ice control will be applied to main aisles and/or parking areas as needed. Critical areas such as hills, lanes, intersections, and means of egress will be attended to first, followed by non-priority areas. For condominium accounts, salting of driveways is an additional charge."

{¶ 80} According to the terms of this contract, H&M was contracted to shovel the individual unit entrance and walkway areas. In looking at the plain language of the contract, H&M was not contracted to salt, or otherwise deice, the individual unit entrance and walkway areas. This conclusion is bolstered by Figueroa's testimony that it was H&M's responsibility "to shovel the walkways that lead up to" the condominiums' doors and salting of these areas was done on an as-requested basis. Additionally, Mazzurco testified that, according to the contract, H&M was "only

supposed to salt the parking lot" and this particular contract did not include "the paragraph . . . for salting [the] walkway . . . ."

{¶ 81} We turn to whether H&M breached their duty to exercise reasonable care and their duty to perform according to the terms of their contract with Clarkwood.

### iv. Breach

{¶ 82} Upon review of the evidence in the record, we find that Jonita, Ernest, Figueroa, Workman-Stafford and Mazzurco offered no testimony that H&M's performance in clearing the Condo's front entrance and walkway area of ice and snow fell below the standard of care.

{¶ 83} All witnesses testified in their depositions that water pooled in the walkway area at the bottom of the Condo's front steps and this water froze during a freeze-thaw cycle immediately after a major snowstorm. Plaintiffs' expert witnesses also agreed to this fact. However, Ohio law deems this scenario a natural accumulation of ice, and there is no duty to remove a natural accumulation of ice. *See, e.g., Goodwill Indus. v. Sutcliffe,* 2000 Ohio App. LEXIS 4131 (9th Dist. Sept. 13, 2000) ("[L]iability should not automatically attach when ice forms in an insubstantial, commonly encountered hollow in the center of a parking lot. The fact that a pool of ice has formed in a two-to-three inch depression will not, in and of itself, change the natural accumulation of ice into an unnatural one.").

{¶ 84} Jonita testified that she did not know when H&M last removed snow and ice from the Condo's front entrance area, but there was snow on both sides of

the walkway when she fell. Jonita further testified that pooling of water and ice in this area was "typical" over the 30-plus years that she has lived in the Condo.

{¶ 85} Ernest testified that he did not recall if H&M removed snow and ice from the Condo's front entrance area on the morning of Jonita's fall. Ernest further testified that snow was "piled up to the side of the walkway area" and this was "typical."

{¶ 86} Figueroa testified that Clarkwood contracted with H&M to shovel the front entrance areas up to two times per day when the triggered depth of snow was reached and to salt them on as-needed basis when requested. Figueroa further testified about various complaints Clarkwood received about falls on the property due to snow and ice, but she did not testify about whether H&M did, or did not, do their job properly concerning the front entrance area of the Condo on December 3, 2020.

{¶ 87} Workman-Stafford testified that she saw Jonita on the ground after Jonita fell, but she did not see Jonita fall. Workman-Stafford further testified that "[j]ust about all units" experienced pools of ice below their steps and that H&M typically shoveled these walkways. Workman-Stafford also testified that H&M did a "good job" shoveling "[w]hen they [did] it."

{¶ 88} Mazzurco, who was shown photographs of the front entrance of the Condo where Jonita fell, testified that he did not "think there was anything wrong with the way it looks like it was being shoveled." We note here that none of the photographs in the record of this case were taken on the day Jonita fell. Mazzurco

testified that H&M was contracted to shovel the "main entrance" and "primary walkway" areas of the condominiums and that, according to the contract, these are "critical areas," which were to "be attended to first."

{¶ 89} Zimmerman offered no testimony as to H&M's performance. An exhaustive reading of Allin's 74-page affidavit and expert report reveals that he offered no evidence concerning H&M's falling below the standard of care of a reasonable snow and ice maintenance company.

{¶ 90} Upon review, we find no evidence that H&M "substantially increased" the risk of injury beyond the normal risk associated with ice and snow. Furthermore, we find no evidence that H&M caused an "unnatural" accumulation of ice and snow where Jonita fell. *See Mubarak*, 2004-Ohio-6011, at ¶ 19 ("Unnatural accumulations are caused by a person doing something that would cause ice and snow to accumulate in an unexpected place or way . . . ."). Simply put, inclement weather conditions in Northeast Ohio caused black ice to form at the bottom of the front steps to the Condo. Nothing in the record suggests that this black ice would not have formed had H&M done anything differently.

{¶ 91} Evidence in the record established that Plaintiffs had lived in the Condo for more than 30 years when the incident at issue in this case occurred. Plaintiffs knew that water would pool, then freeze if the temperature dropped below a certain point, at the bottom of the front steps of the Condo. Plaintiffs knew it was snowy, cold and freezing when they left the Condo on the morning of December 3,

2020. It was dark outside at the time Jonita fell, and a winter storm had left an average of 9.5 inches of snow on the ground on December 1, 2020.

{¶ 92} Viewing the evidence in a light most favorable to Plaintiffs, we find that there are no genuine issues of material fact, H&M is entitled to judgment as a matter of law and reasonable minds could come to but one conclusion and that conclusion is adverse to Plaintiffs. *See Hoenigman,* 1990 Ohio App. LEXIS 131 ("[T]here is no evidence that the snow and/or ice was cleared negligently. In fact, [the plaintiff] testified that there was some snow when he traversed the parking lot, but that there was nothing unusual about the parking lot condition from other days. Even assuming arguendo that the snow was removed negligently, there is no evidence that the risk of injury was substantially increased from the risk associated with the natural accumulations of ice and snow during the winter months.").

{¶ 93} Accordingly, the Plaintiffs' second assignment of error is overruled.

{¶ 94} Judgment affirmed.

It is ordered that appellees recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

MICHELLE J. SHEEHAN, J., and
DEENA R. CALABRESE, J., CONCUR